USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/19/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANGEL DECASTRO, SUSAN CALVO, and
KELLY MACON, *individually and on behalf
of all others similarly situated*,

Plaintiffs,

v.

THE CITY OF NEW YORK, and THE NEW
YORK CITY TAXI and LIMOUSINE
COMMISSION,

Defendants.

No. 16-CV-3850 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

Plaintiffs Angel DeCastro, Susan Calvo, and Kelly Macon brought this action against the City of New York and its Taxi and Limousine Commission (together, "the City") alleging that the City's enforcement of its regulations regarding the operation of vehicles for hire violated their constitutional rights. Plaintiffs were previously granted summary judgment on their claims that the City's practice of seizing vehicles belonging to certain groups of vehicle owners, on suspicion that the vehicles were being operated for hire without a license, was unconstitutional. Now before the Court is Plaintiffs' motion to certify this case as a class action. For the following reasons, the motion is denied.

## BACKGROUND

This case's factual background was recounted in detail in the Court's prior decision granting in part and denying part the parties' cross-motions for summary judgment. *See DeCastro v. City of New York*, 278 F. Supp. 3d 753, 756–63 (S.D.N.Y. 2017) ("*DeCastro I*"). Familiarity

with that opinion is assumed. Only those facts that are relevant to resolving the instant motion are set forth in this section.

## I.     Regulatory Background

Central to this case are regulations promulgated by the New York City Taxi and Limousine Commission ("TLC") governing the use of vehicles "for hire" in New York City.  *See* N.Y.C. Admin. Code §§ 19-506(b), (h).  Section 19-506(b)(1) makes it a violation to knowingly operate or allow another to operate "for hire any vehicle as a taxicab, coach . . . or for-hire vehicle in the city, without first having obtained or knowing that another has obtained a license for such vehicle[.]"  Section 19-506(b)(2) makes it a violation to knowingly operate or allow another to operate "any vehicle licensed as a taxicab . . . or for-hire vehicle in the city in a manner that is beyond the scope of the activities permitted by such vehicle's license[.]"  These provisions respectively impose fines, imprisonment, or both, on those found guilty of violating them "upon conviction in criminal court."   *See* N.Y.C. Admin. Code § 19-506(b).  Section 19-506(e)(1), however, provides for civil penalties "[i]n addition to or as an alternative to the penalties provided for the violation of [§ 19-506(b)(1)]." Section 19-506(e)(2) provides for civil penalties solely "[a]s an alternative to the penalties provided for the violation of [19-506(b)(2)]."

The regulations set forth additional mechanisms to enforce § 19-506(b). As is relevant here, any officer or designated TLC employee may seize a vehicle "which he or she has probable cause to believe is operated . . . without a vehicle license" in violation of § 19-506(b)(1), or without the appropriate license for such operation, in violation of § 19-506(b)(2).  *See* § 19-506(h)(1).  Unless the charges are dismissed, "no vehicle seized pursuant to [§ 19-506(h)(1)] shall be released until all fees for removal and storage and the applicable fine or civil penalty" are paid, or a bond is posted.  In addition, an owner's interest in their vehicle, when operated in violation of § 19-

2

506(b)(1) or (b)(2), is "subject to forfeiture" if the owner has been "convicted in the criminal court of, or found liable in accordance with [§ 19-506(e)]" for at least two such violations within a 36 month period. *See* § 19-506(h)(2).

## II.     Background of Related Decisions

Plaintiffs' motion for class certification exists against the backdrop of various decisions in this case and in Judge Caproni's prior decisions in *Harrell v. City of N.Y.*, 138 F. Supp. 3d 479 (S.D.N.Y. 2015) ("*Harrell I*"), *reconsidered in part sub nom. Harrell v. Joshi*, No. 14-CV-7246 (VEC), 2015 WL 9275683 (S.D.N.Y. Dec. 18, 2015) ("*Harrell II*"); *Calvo v. City of N.Y.*, No. 14-CV-7246 (VEC), 2017 WL 4231431 (S.D.N.Y. Sept. 21, 2017) ("*Calvo I*"); and *Calvo v. City of N.Y.*, No. 14-CV-7246 (VEC), 2018 WL 1633565, at *3 (S.D.N.Y. Apr. 2, 2018) ("*Calvo II*").

### A.    *Harrell* and *DeCastro I*

In *Harrell I*, Judge Caproni held that the City's practice of seizing vehicles without a warrant was unconstitutional as applied to straight-plate vehicle owners (i.e., vehicle owners whose license plates are not issued by the TLC), who had not been convicted of, or found liable for, a violation of § 19-506(b)(1) in the preceding 36 months.  138 F. Supp. 3d at 484.  *Harrell I* did not address whether the City's vehicle seizures, as applied to owners who did have such a record of § 19-506(b)(1) violations, were constitutional. Nor did it address the constitutionality of seizing TLC-plated vehicles for violations of § 19-506(b)(2).[1]

---

[1] Judge Caproni granted in part and denied in part the City's motion to reconsider *Harrell I*, reaffirming her prior holding that "the City's policy of seizing the [straight tag] vehicles of first time violators" of § 19-506(b)(1) was unconstitutional, but concluding that two of the named plaintiffs were not entitled to summary judgment based on "evidence that they were not first time violators when the complained of seizures occurred."  *Harrell II*, 2015 WL 9275683, at *4.  She subsequently denied the *Harrell* plaintiffs' motion to amend their complaint to add claims on behalf of second or subsequent violators of § 19-506(b), *see* February 9, 2016 Order, *Harrell v. City of New York*, No. 14-CV-7246 (VEC) (Dkt. 80), as well as the claims of Angel DeCastro, whose vehicle was seized for a first-time § 19-506(b)(1) violation, but which had a TLC license plate.  *See* March 31, 2016 Order, *Harrell v. City of New York*, No. 14-CV-7246 (VEC) (Dkt. 96) (explaining that "[t]h[e] case was brought on the theory that straight tag vehicles were being improperly seized; it is too late in the case to alter the fundamental premise of the case.").

On August 26, 2016, Plaintiffs DeCastro, Calvo, and Macon filed the operative complaint in this action, on behalf of the following: straight-plate vehicle owners whose vehicles were seized based on second or subsequent violations of § 19-506(b)(1) within the preceding 36 months; TLC-plated vehicle owners whose vehicles were seized for violations of § 19-506(b)(1) (whether first-time or not); and TLC-plated vehicle owners whose vehicles were seized for violations of § 19-506(b)(2). Plaintiffs asserted that the City's practice of seizing the vehicles of such owners violated the Fourth and Fourteenth Amendments. *See* Am. Compl. ¶ 9 (Dkt. 27).

On February 3, 2017, Plaintiffs moved for summary judgment against the City based on their respective vehicle seizures, each of which occurred as a result of § 19-506(b)(1) violations. The constitutionality of the City's seizure practices as applied to TLC-licensed drivers who violate their licenses under § 19-506(b)(2) was not adjudicated. *DeCastro*, 278 F. Supp. 3d at 757 n.4. Because the vehicles of second or subsequent violators of § 19-506(b)(1) are subject to civil forfeiture, *see* § 19-506(h)(2), the City argued on its cross-motion for summary judgment that the "forfeiture exception" to the warrant requirement applied to the claims of Calvo and Macon.[2] The City, accordingly, maintained that those seizures were constitutional. *See DeCastro I*, 278 F. Supp. 3d at 769–70.

On September 30, 2017, this Court concluded that the City had "provided no evidence that the TLC inspectors who effected the seizures at issue had any reasonable basis for believing that [plaintiffs] had been 'convicted' of or 'found liable' for any prior violations at the time of the seizures." *Id.* at 769. Because the City could not establish that its officers had probable cause to

---

[2] Only Plaintiffs Calvo and Macon had both been found liable for violations of § 19-506(b)(1) in the preceding 36 months from when the seizures at issue occurred. DeCastro, by contrast, was a first-time violator who was operating a TLC-plated vehicle—not a straight-plate vehicle—at the time it was seized. Because the vehicle had not yet been licensed as a for-hire vehicle by the TLC, however, it was not authorized to bear TLC license plates. DeCastro was therefore issued a summons for violating § 19-506(b)(1), as opposed to § 19-506(b)(2).

believe that the relevant vehicles were subject to civil forfeiture under § 19-506(h)(2), it could not invoke the "forfeiture exception" to the warrantless seizure of Calvo and Macon's vehicles. Those plaintiffs were therefore granted summary judgment on their Fourth Amendment claims.[3] Pertinent here, the Court further held that Plaintiffs Calvo and Macon had established "not only a violation of their constitutional rights," but also the "existence of a municipal policy" to unconstitutionally seize vehicles of second or subsequent violators of § 19-506(b)(1). That holding was based on the "the undisputed evidence," with respect to such seizures, "showing that TLC inspectors do not have probable cause to believe a vehicle is subject to forfeiture under § 19-506(h)(2)." 278 F. Supp. 3d at 772.

As previously noted, DeCastro's vehicle was seized for a first-time violation of § 19-506(b)(1). The Court thus granted summary judgment as to both his Fourth and Fourteenth Amendment claims. Indeed, the City provided no reason why the fact that his vehicle had a TLC license plate altered the *Harrell* court's holding that warrantless seizures of vehicles based on first-time violations of § 19-506(b)(1) were unconstitutional.

### B. **The Denial of Class Certification in** *Calvo*

The plaintiffs that successfully obtained summary judgment against the City in *Harrell* filed a motion seeking to certify a class of straight-plate vehicle owners whose vehicles were seized for first-time violations of § 19-506(b)(1). *Calvo I*, 2017 WL 4231431, at *3.[4] The court initially declined to certify the class because Plaintiffs had "failed to propose a class that [was] defined in such a way that everyone within it had standing." *Id.* at *7. Hypothesizing that "[a] class consisting

---

[3] The Court nonetheless held that the City's post-seizure procedures for second or subsequent violations of § 19-506(b)(1) satisfied due process and thus granted Defendants' motion for summary judgment with respect to the Fourteenth Amendment claims asserted by Calvo and Macon.

[4] In 2016, Plaintiff Harrell was dismissed from the *Harrell* actions with prejudice for failure to prosecute and failure to provide discovery, resulting in the opinion on the class certification motion being re-named *Calvo v. City of New York*, although the case remains captioned as *Harrell v. City of N.Y.* on ECF. *See* Order at Dkt. 160, No. 14-CV-7246 (S.D.N.Y. Nov. 14, 2016).

of registered owners who were either operating the vehicles at the time that they were seized or who retrieved the vehicles from the TLC might be sufficient to narrow the class to those who have Article III standing," Judge Caproni permitted the plaintiffs to seek certification of a narrower class. *Id.*

The *Calvo* plaintiffs then filed their second motion for class certification seeking to certify a class of "all registered owners of straight [plate] vehicles seized for alleged first-time violations of [§ 19-506] from September 8, 2011 to the present who were operating the vehicle at the time of the seizure, or who retrieved the vehicle personally or through an agent by paying towing and storage fees." *Calvo II*, 2018 WL 1633565, at *3. This time, although the court found that it was "unclear whether all members of the proposed class would have standing," it "assume[d] without deciding" that plaintiffs had defined a class in which every member had standing. *Id.* at *5. Nonetheless, Judge Caproni ultimately declined to certify the class because individual questions—pertaining primarily to proving membership in the class—predominated over common questions. *See id.* at *8. Concluding that the City's "credible evidence of widespread fraud in the registration of vehicles that were seized for violations of 19-506," precluded a finding that there was any "definable class that would satisfy Rule 23(b)(3)," the court denied plaintiffs' motion with prejudice. *Id.* at *9.

### C. Plaintiffs' Class Certification Motion

On November 8, 2017, Plaintiffs in this action filed a motion seeking to certify a class of "[a]ll registered owners of vehicles seized since September 8, 2011 for alleged second or subsequent violations of [§ 19-506(b)(1)]; or for any violation of Section 19-506 involving a vehicle bearing TLC license plates; who were operating the vehicle at the time of the seizure or who retrieved the vehicle personally or through an agent by paying towing and storage fees." Pls.

Mem. at 4 (Dkt. 118).  On June 5, 2018, Plaintiffs informed the court that they had filed a petition under Fed. R. Civ. P. 23(f) seeking immediate appellate review of the *Calvo II* decision.  This Court subsequently stayed Plaintiffs' class certification motion pending the Second Circuit's decision on whether to grant the *Calvo* plaintiffs' Rule 23(f) petition.  After the Circuit denied the petition, the parties filed supplemental letters addressing if and how Judge Caproni's ruling in *Calvo II* should impact the Court's decision on Plaintiffs' class certification motion here.

## LEGAL STANDARDS

To succeed on their motion for class certification, Plaintiffs must first surpass the threshold requirements of Article III standing and ascertainability.  *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017).  Plaintiffs must then demonstrate, "by a preponderance of the evidence that each of Rule 23's requirements have been met."  *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

To establish Article III standing, the "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  "The filing of suit as a class action does not relax this jurisdictional requirement."  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006).  In addition, "Article III's jurisdictional requirements [apply] to each member of a class[—]no class may be certified that contains members lacking Article III standing."  *In re Elec. Books Antitrust Litig.*, 12 Civ. 3394(DLC), 2014 WL 1641699, at \*8 (S.D.N.Y. Apr. 24, 2014).  The class, accordingly, must be "defined in such a way that anyone within it would have [Article III] standing."  *Denney*, 443 F.3d at 264.  To determine whether

Plaintiffs have done so, the Court looks to the class definition and Plaintiffs' allegations. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 532 (S.D.N.Y. 2018).

The ascertainability requirement, which is a "modest threshold requirement . . . consider[s] whether [the] proposed class is defined using objective criteria that establish a membership with definite boundaries." *Petrobras*, 862 F.3d at 269. A proposed class fails to be ascertainable only where the "class definition is indeterminate in some fundamental way." *Id.*

Assuming Plaintiffs can establish standing and ascertainability, they must then satisfy the Rule 23(a) requirements, which are that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a). More colloquially known as "numerosity, commonality, typicality and adequate representation," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011), "[a] class may be certified only if, 'after a rigorous analysis,'" these requirements are met. *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)).

In addition to Rule 23(a), the proposed class must also satisfy Rule 23(b). Here, Plaintiffs seek to certify a class under Rule 23(b)(3) which mandates that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In conducting the superiority inquiry, courts may consider: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or

against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*

## DISCUSSION

### I.     Standing

It is ultimately not clear to the Court that Plaintiffs have met their burden of establishing that the threshold requirement of standing has been satisfied with respect to the proposed class, as explained in detail below. The Court nonetheless assumes, without deciding, that the proposed class has standing for purposes of this Opinion.

In assessing whether a plaintiff has Article III standing to challenge a seizure of property, "it is the *injury* to the party seeking standing that remains the ultimate focus." *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999) (emphasis added). Thus, although "ownership and possession [of property] generally may provide evidence of standing" to contest its forfeiture, these attributes do not necessarily confer standing. *Id.* Indeed, where the owner of property merely "hold[s] title to it for somebody else"—often referred to as a "straw owner"—he or she "do[es] not . . . suffer an injury when the property is taken." *Id.; see also United States v. One 1982 Porsche 928, Three-Door, License Plate 1986/NJ Temp./534807 (Auto.)*, 732 F. Supp. 447, 451 (S.D.N.Y. 1990) (recognizing that, "especially in the world of drug trafficking and other illegal operations[,]" individuals can arrange for others to serve as the record owner of property in an "attempt to disguise their interests in property by not placing title in their own names."). In other words, "[t]here must be some indicia of reliability or substance to claims of ownership to reduce the likelihood of a false or frivolous claim." *United States v. $829,422.42*, 561 Fed. App'x 100, 100 (2d Cir. 2014).

A court analyzing standing in a case contesting the seizure of property thus "looks beyond the formal title to determine whether the record owner is the 'real' owner or merely a 'strawman' set up either to conceal illegal dealings or to avoid forfeiture." *One 1982 Porsche,* 732 F. Supp. at 451. To do so, courts may consider evidence regarding who purchased the property, the source of funds used to do so, as well as payments to maintain the property. *See United States v. 500 Delaware St.*, 113 F.3d 310, 312 (2d Cir. 1997) (affirming that title holder of property was straw owner and that the real owner "made mortgage, property tax, and insurance payments, paid utility bills, and maintained the property and made repairs").

For the purposes of assessing standing here, Plaintiffs' proposed class of registered owners are analyzed in two groups, consistent with Plaintiffs' class definition: (1) registered owners who were not operating the vehicle when it was seized, but who retrieved the vehicle from the TLC either personally or through an agent; and (2) registered owners who were operating the vehicle when it was seized ("registered owner-operators").

With respect to the first group, Plaintiffs' class definition limits the registered owners to those who "retrieved the vehicle personally or through an agent *by paying towing and storage fees.*" Pls. Mem. at 4 (emphasis added). These payments indicate that those registered owners had some financial stake in the seized vehicles, suggesting that they were not merely nominal or straw owners—even though they were not operating the vehicles when they were seized. *See One 1982 Porsche,* 732 F. Supp. at 451 (noting that a true ownership interest in property can be demonstrated by various means including proof of a financial stake in the property). And to the extent these registered owners are the true owners of the vehicles, the payment of towing and storage fees provides evidence that they suffered an injury-in-fact in connection with the seizures. *See Maineau v. City of New York*, No. 11-CV-2657, 2013 WL 3093912, at *11 (E.D.N.Y. Jun. 18,

2013) (concluding that even nominal damages under § 1983 are "sufficient . . . redress for the purposes of Article III standing").[5] At the same time, however, the City has submitted the declaration of a handwriting expert (originally submitted to and considered by the *Calvo* court) attesting that the signatures of registered owners did not match across their own documents, suggesting that at least some of these documents were forged. *See* Selvin Decl. Ex. C (Dkt.138-3). This evidence further suggests that the documented registered owner who supposedly paid the towing and storage fees to retrieve seized vehicles may not be the true owner of those vehicles, and would therefore lack standing to contest their seizure. The Court thus has concerns that some members of this subgroup of the class may not actually have standing as the class is defined.[6]

With respect to registered owner-operator class members, Plaintiffs contend that "the City's interference with their use of the vehicle at the time of seizure readily establishes indicia of ownership and an injury in fact sufficient to confer standing." Pl's Mem. at 9. It is true that a person's exercise of dominion and control over property is evidence of a *bona fide* ownership interest in it, and that an interference with the use of one's property can constitute an injury-in-fact for standing purposes. *See, e.g.*, *500 Delaware St.*, 113 F.3d at 312. But the City has presented evidence that some registered owner-operators may have been straw owners, even though they were operating the vehicles when seized. For example, the City has identified instances where certain owner-operators retrieved their vehicles after they were seized a second time, but then subsequently abandoned the vehicles after they were seized a third time. *See* Murray Decl. Table

---

[5] Of course, how to determine whether a registered owner actually paid for the towing and storage fees is a more difficult question. But it is one that goes to determining membership in the class, not standing.

[6] In their reply, Plaintiffs contend that the City's focus on whether a registered owner is the "beneficial owner" of the vehicle "ignores the parameters of the class definition . . . which encompasses only registered owners . . . who suffered some cognizable injury-in-fact, be it a seizure while they were operating their own vehicle or their demonstrable payment (direct or through an agent) of towing and storage fees." Olson Decl. ¶ 5. But this misses the point: a straw owner of a vehicle who is operating it when it is seized, or who pays for its retrieval, is not injured in either scenario because he or she is a straw owner. *See Calvo II*, 2018 WL 1633565, at *4–5; *Cambio Exacto*, 166 F.3d at 527 (explaining that a straw owner of property "do[es] not suffer an injury when the property is taken").

at ¶ 49 (Dkt. 137). As explained in *Calvo II*, this subsequent abandonment "raises a significant question of fact as to whether [the registered owner] was a straw owner all along and therefore never had a cognizable injury associated with the seizure of the vehicle." [7] 2018 WL 1633565, at *4.

Plaintiffs' class definition does not limit the group of registered owner-operators to those who actually paid the towing and storage fees. It is thus possible that these registered owners (for example, those who abandoned the vehicles after a subsequent seizure) had no financial stake in the vehicles themselves, again raising concerns about the legitimacy of their ownership interest. Even if the Court were to modify the class definition to limit the registered owner-operator group to those who paid the towing and storage fees, the City's evidence of registration fraud more broadly still raises a concern that members of this group may be nominal owners that suffered no injury from the vehicle seizures. [8] In any event, because the evidence of curious ownership records and fraud are more appropriately addressed in assessing class membership, the Court will, as the *Calvo* court did, assume without deciding that all members of the class have standing.

## II. Ascertainability

Defendants argue that the proposed class is not ascertainable for many reasons, namely, that Plaintiffs have failed to sufficiently define the class; that the class consists of straw owners;

---

[7] To be sure, Plaintiffs acknowledge that the claims of a registered owner who abandons a vehicle after it is seized would not be part of the class. Pls. Mem. at 4; Olson Decl. ¶ 8. But this does not address those registered owners that *did* retrieve the vehicle after a second seizure, and then abandoned the vehicle after a *subsequent* seizure. The claims of such registered owners with respect to the second seizure would still be part of the class as Plaintiffs have defined it, even though those registered owners may have been straw owners for the reasons explained above.

[8] As additional support for the notion that registered owner-operators may be straw owners, the City asserts that one John Doe was the registered owner of at least 65 vehicles which the TLC seized 97 times between September 2011 and March 2015. *See* Murray Decl. ¶ 21 & Ex. P. The John Doe was the driver during just one of these seizures. He is thus a member of the "registered owner-operator" subclass with respect to that seizure, as it occurred after a previous § 19-506 violation. The City suggests that his ownership record raises questions about the legitimacy of his ownership interest even in the vehicle he was driving. The Court, however, is not so certain. The fact that an individual is the registered owner of a fleet of vehicles, and was operating one of them when they were seized by the City, does not on its face establish that the individual lacked a genuine ownership interest in the vehicle he was driving.

that the City has individual defenses to the seizures of putative class members' vehicles; and that individualized proof is required to determine class membership. The Court agrees that Plaintiffs have failed to sufficiently define the class, but only insofar as they have not included an end date to the proposed class period. The remainder of Plaintiffs' arguments do not bear on the question of ascertainability, but rather on whether common questions predominate over individual ones.

Plaintiffs have defined the class based on objective criteria. To be a member of the class, a person must be (1) the registered owner of: a straight-plate vehicle that was seized by the City for a second or subsequent violation of § 19-506(b)(1), or a TLC-plated vehicle that was seized for any violation of § 19-506; (2) who paid towing and storage fees to retrieve the vehicle either themselves or through an agent. The challenges Plaintiffs may face in establishing that they actually paid for the towing and storage fees, and that the relevant seizure was unconstitutional, "more clearly weigh on the burden of identification, not the possibility." *Royal Park Investments SA/NV v. Deutsche Bank Nat'l Trust Co.*, 2018 WL 1750595, at *10 (S.D.N.Y. Apr. 11, 2018) (emphasis omitted).

As for the relevant time period, however, Plaintiffs define the class period as beginning in September 8, 2011, but they do not specify a clear end date. This precludes a finding that the ascertainability requirement has been met. *See, e.g.*, *Bauer-Ramazzani v. Teachers Ins. & Annuity Ass'n of America-College Retirement & Equities Fund*, 290 F.R.D. 452, 462 (S.D.N.Y. 2013) ("An end date for the class period is necessary so the class members can be presently ascertained." (quotation omitted)). For the purposes of this Opinion only, the Court will select the date that the Complaint was filed, May 24, 2016, as the end date. *See Hart v. Rick's NY Cabaret Int'l, Inc.*, No. 09 CIV. 3043(PAE), 2013 WL 11272536, at *5 (S.D.N.Y. Nov. 18, 2013) (citing cases in which district courts used their discretion to set an end date for a class period, including the date the

Complaint was filed). Having established a fixed temporal limitation, the class is now ascertainable.

## III.    The Statute of Limitations

The City is correct that Plaintiffs' proposed class period is impermissibly overbroad because it encompasses claims that are barred by the statute of limitations.

Plaintiffs' class period, as previously noted, begins on September 8, 2011. But the statute of limitations for § 1983 claims, which is governed here by New York State law, is three years. *See Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015). Plaintiffs filed this action on May 24, 2016. They nevertheless argue that, pursuant to *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), the filing of the *Harrell* action on September 8, 2014, tolled the statute of limitations for later-filed putative class actions on behalf of all persons encompassed by the initial *Harrell* complaint. The Supreme Court recently clarified, however, that "*American Pipe* does not permit the maintenance of a follow-on class action past expiration of the statute limitations." *China Agritech, Inv. v. Resh*, 138 S. Ct. 1800, 1804 (2018). Rather, *American Pipe* addresses "only putative class members *who wish to sue individually* after a class-certification denial." *Id.* at 1806 (emphasis added) (holding that a putative class representative could not bring his claims as a new class action after the statute of limitations expired). The claims of *all* putative class members here that arose prior to May 24, 2013, are therefore not subject to *American Pipe* tolling. [9]

Plaintiffs separately argue that equitable tolling should apply to the claims of second or subsequent violators of § 19-506(b). The Court disagrees. The thrust of the equitable tolling

---

[9] The initial complaint in *Harrell* addressed the seizure of vehicles based on first-time violations of § 19-506(b) in connection with the use of a vehicle "as an unlicensed taxi," and therefore did not encompass vehicles seized for first-time violations of § 19-506(b)(2). Nor would putative class members here whose vehicles were seized for second or subsequent violations of § 19-506(b)(1) have been a part of the *Harrell* complaint and thus, the claims of those plaintiffs existing prior to May 24, 2013, would be time-barred even under Plaintiffs' erroneous application of *American Pipe*.

doctrine "is that a statute of limitations does not run against a plaintiff who is unaware of his cause of action." *Lopez v. Nassau Cty. Sheriffs Dep't*, No. 17-CV-3722 (DRH) (GRB), 2018 WL 3321430, at *4 (E.D.N.Y. July 5, 2018) (quoting *Cerbone v. Int'l Ladies' Garment Workers' Union,* 768 F.2d 45, 48 (2d Cir. 1985)). The party seeking to invoke equitable tolling must demonstrate that they "acted with reasonable diligence during the time period [they] seek[] to have tolled," and must "prove[] that the circumstances are so extraordinary that the doctrine should apply." *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80–81 (2d Cir. 2003); *see also Lopez*, 2018 WL 3321430, at *5 (E.D.N.Y. July 5, 2018) (citing cases permitting equitable tolling claims based on mental or physical impairments of plaintiffs that prevented them from handling their legal affairs and noting that "only in a limited number of cases do extraordinary circumstances exist" that warrant equitable tolling).

Here, Plaintiffs request equitable tolling on the ground that they "only learned of the uniform application of Defendants' seizure program regardless of prior convictions when the summary judgment motion in *Calvo* was briefed." Pls. Reply Mem. at 9. Essentially, they seek tolling of the claims of second or subsequent violators, because they were unaware that the City would not be able to prove that its officers had probable cause to seize the relevant vehicles until after discovery in the *Harrell* cases. But whether Plaintiffs were aware of the City's probable cause (or lack thereof) as to the seizures at issue is irrelevant to whether they had "actual knowledge of the facts that comprise [their] caus[e]s of action." *Cerbone*, 768 F.2d at 48. The absence of probable cause is not part of Plaintiffs' *prima facie* Fourth Amendment claims; rather, the existence of probable cause is part of the City's affirmative defense. *See U.S. v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 89 (2d Cir. 2002). Plaintiffs thus fail to offer any reason why they could not have asserted the claims of second or subsequent violators when they initially

filed the *Harrell* case that could justify equitable tolling. *See Levy v. BASF Metals Ltd.*, No. 1:15-cv-7317-GHW, 2017 WL 2533501, at *8 (S.D.N.Y. June 9, 2017) (declining to apply equitable tolling where plaintiff claimed that she was not aware of certain defendants' wrongdoing until a class action complaint was filed in another case because "she did not learn anything new about her injury or any potential claims supporting remuneration for her injury" from that complaint). Absent extraordinary circumstances, which Plaintiffs have not alleged, that could explain why they did not assert the claims of second or subsequent violators of § 19-506(b) when they were aware of those class members' injuries, equitable tolling is not warranted.

Accordingly, the claims of proposed class members existing before May 24, 2013 are barred by the statute of limitations. The Court will now consider whether Plaintiffs' proposed class, with the class period modified to begin on May 24, 2013, and end on May 24, 2016, meets the certification requirements.

## IV.    Rule 23 Analysis

Plaintiffs have met the numerosity, commonality, and typicality requirements, and the Court assumes, again without deciding, that adequacy of representation is also satisfied. The proposed class nevertheless fails to satisfy the predominance requirement of Rule 23(b)(3). Plaintiffs' motion is thus denied on that basis.

### A. Numerosity

Numerosity under Rule 23(a)(1) is presumed satisfied when there are more than 40 class members. *See, e.g.*, *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011). Plaintiffs estimate that the class is comprised of at most 14,000 seizures and presumably

thousands of registered owners.[10]  Although the Court has narrowed the class period to begin on

May 24, 2013, the City does not contest numerosity. Plaintiffs have met this requirement.

### B. Commonality

To establish commonality under Rule 23(a)(2), Plaintiffs must show that class members

"have suffered the same injury" and that there is at least one question common to the class that is

capable of "classwide resolution."  *Wal-Mart*, 564 U.S. at 350.  A question is common to the class

"if it is susceptible to generalized, class-wide proof."  *In re Nassau Cty. Strip Search Cases*, 461

F.3d 219, 227 (2d Cir. 2006) ("*In re Nassau Cty.*").

Plaintiffs have established commonality.  The proposed class members have allegedly

suffered the same injuries, primarily, the payment of fees, as a result of "a specific policy

promulgated by Defendants, namely that Defendants . . . established a practice" of seizing vehicles

for violations of § 19-506(b) without a warrant.  Common questions of law and fact therefore exist

because "the claims of the proposed class stem from the same alleged unconstitutional conduct of

the defendants."  *Stinson v. City of New York*, 282 F.R.D. 360, 370 (S.D.N.Y. 2012) (commonality

satisfied where plaintiffs challenged the constitutionality of the NYPD's alleged practice of issuing

summonses without probable cause in order to meet quota requirements).  It is true that this Court

has already held that "the undisputed evidence shows that TLC inspectors do not have probable

cause to believe a vehicle [operated or owned by a second or subsequent violator of § 19-506(b)(1)]

is subject to forfeiture under § 19-506(h)(2)," rendering those class members' vehicle seizures

unconstitutional. *DeCastro I*, 278 F. Supp. 3d at 772. But the Court must still consider common

---

[10] Plaintiffs have submitted quarterly reports that the TLC produced pursuant to § 19-506(m) which indicate that over 24,000 summonses for vehicle seizures were issued between the fourth quarter of 2012—not of 2011, as Plaintiffs state—and the first quarter of 2016.  *See* Gallagher Decl. Ex. 2 (Dkt. 120-2). Plaintiffs estimate that 10,000 of those seizures are not part of the class because they were associated with straight-plate first-time violations of §19-506(b)(1).

questions—even if they have already been resolved in certain Plaintiffs' favor—in the class action analysis. *See Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, No. 96 CV 8414(KMW), 2013 WL 4647190, at *6 (S.D.N.Y. Aug. 29, 2013); *see also In re Nassau Cty.*, 461 F.3d at 227 (requiring that common question of the constitutionality of defendant's strip search policy be considered in the Court's commonality analysis even though defendant had already conceded the policy was unconstitutional). Simply put, "[t]his cases raises, at a minimum, a common question as to the legality of Defendants' vehicle seizures." *Calvo II*, 2018 WL 1633565, at *5 n.18. Commonality is, therefore, satisfied.

### C. Typicality

Typicality under Rule 23(a)(3) exists "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Vincent v. Money Store*, 304 F.R.D. 446, 455 (S.D.N.Y. 2015) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). In analyzing typicality, the Court looks "not at the plaintiffs' behavior, but rather at the defendant's actions." *Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 132 (S.D.N.Y. 2014).

Plaintiffs have established typicality. As previously noted, the class members' claims arise from the same course of events—namely, the City's seizure of vehicles for which they were the registered owner, and for which they had to pay towing and storage fees to have them retrieved.

The City argues that class members who violated § 19-506(b)(2) are not similarly situated to class members whose vehicles were seized for second or subsequent violations of § 19-506(b)(1). In support of this argument, it contends that, unlike registered owners of unlicensed vehicles, the owners of TLC-licensed vehicles have: (1) "voluntarily consented to the agency's strict oversight," and (2) fulfilled "requirements pertaining to insurance and other financial

responsibilities." Defs. Mem. Opp. at 16. The City does not explain, however, why these differences would impact Plaintiffs' Fourth Amendment arguments with respect to the City's seizure of vehicles that are premised on violations of § 19-506(b)(2).[11]

It is true that no Court has yet to address whether the application of the City's seizure policy, as codified in § 19-506(h)(1), to enforce violations of § 19-506(b)(2)—as opposed to (b)(1)—is unconstitutional. Indeed, *Harrell* addressed only the constitutionality of the City's seizure of straight-plate vehicles for first-time violations of § 19-506(b)(1). *DeCastro I* addressed the same only for second or subsequent violations of § 19-506(b)(1), and for first-time violations of § 19-506(b)(1) for TLC-plated vehicles. But as noted, the typicality inquiry focuses on the nature of the putative class members' claims, and whether they arise from the same course of conduct. It does not require a uniform finding of liability as to every class member prior to certification. *Cf. Waggoner v. Barclays PLC*, 875 F.3d 79, 88, 107 (2d Cir. 2017) (affirming certification of class prior to judgment of liability). The fact that a liability determination has not been made as to a subset of the putative class members is, in the Court's view, an issue more appropriately addressed in the predominance requirement. Typicality is satisfied here because: (1) the named Plaintiffs seek to hold Defendants liable for the same conduct that is the basis of the

___

[11] There is a difference in the probable cause analysis between class members who are first-time violators of § 19-506(b)(1) or (2), on the one hand, and class members who are second or subsequent violators of either provision, on the other hand. The vehicles in the latter group are subject to civil forfeiture under § 19-506(h)(2), leaving open the possibility that such an exception to the warrant requirement applies, whereas the vehicles in the former group are not. But it is ultimately the City's burden of demonstrating whether a particular vehicle seizure based on second or subsequent violations of § 19-506(b)(1) or (b)(2) was based on a reasonable belief that the vehicles were subject to civil forfeiture. *See U.S. v. $557,933.89*, 287 F.3d at 89. Thus, the difference between first-time violators of §19-506(b)(2), and second or subsequent violators of § 19-506(b)(1) or 19-506(b)(2), suggests a difference in the City's available defenses for the seizures, not a difference in whether the claims of these class members "arise from the same course of events." *Cf. Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15 CIV. 9936 (LGS), 2017 WL 3868803, at *7 (S.D.N.Y. Sept. 5, 2017) (typicality satisfied where named plaintiffs, who were current or former participants in certain 401(k) plans, sued defendants for mismanagement of the plans under ERISA, including plans for which they were not participants even though absent class members were).

claims of all class members, and (2) the § 19-506(b)(2) violators make the same legal arguments with respect to the constitutionality of the seizures as the § 19-506(b)(1) violators.

### D. Adequacy of Representation

"Adequacy of representation is evaluated in two ways . . . by looking to the qualifications of plaintiffs' counsel; and . . . by examining the interests of the named plaintiffs." *Flores v. Anjost Corp.*, 284 F.R.D. 112, 128–29 (S.D.N.Y. 2012) (citing *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)). Although Plaintiffs' counsel is qualified to represent the class, it is less clear whether Plaintiffs have satisfied their burden of demonstrating that the same is true for the named Plaintiffs. Because the Court ultimately concludes that the proposed class fails to satisfy Rule 23(b)(3), however, it will assume, without deciding, that the named Plaintiffs are sufficient class representatives.

### 1. Class Counsel

First, the City argues that Plaintiffs' counsel lacks the requisite qualifications to represent the class. In addition to questioning Mr. St. Laurent and Mr. Ackman's experience, the City notes that the Court previously had to order Plaintiffs Calvo and Macon to provide witness contact information requested by Defendants—over counsel's objections—and that counsel's motions for class certification in the *Calvo* cases were unsuccessful. The Court is not persuaded. Although it is undisputed that Mr. St. Laurent has not previously been personally certified as class counsel, and that Mr. Ackman's experience as class counsel is limited, their firm, Harris, St. Laurent & Chaudhry LLP, has substantial litigation class action experience. *See* Pl's Reply, Harris Decl., ¶¶ 5–8. Moreover, based on the quality of the advocacy of Plaintiffs' counsel to date, the Court is satisfied that counsel is sufficiently "qualified, experienced and generally able to conduct th[is]

litigation." *Maliarov v. Eros Int'l PLC*, 15-CV-8956 (AJN), 2016 WL 1367246, at \*6 (S.D.N.Y. Apr. 5, 2016).

The City further alleges that Mr. Ackman has falsely represented his class action experience to other federal judges, and that one federal judge noted at oral argument in another matter that he had falsely characterized the holding of a case in his briefing. It is true that Mr. Ackman filed declarations in two unrelated cases attesting that he was "lead counsel" in prior class actions—even though not every one of those prior actions was certified as such. While each of them was either brought as a putative class action, or had a class certification motion pending at some point, Mr. Ackman's declarations could have been more precise. It is also true that another federal judge remarked on the record that Mr. Ackman had mischaracterized the holding of a case in his submissions. But while Defendants' concerns are not entirely without merit, absent more compelling evidence of any prior unethical conduct—and considering that similar evidence has not been produced with respect to his co-counsel in this case—Mr. Ackman will not be disqualified on the current record.

Finally, the City argues that Mr. Ackman has a conflict of interest with those members of the class that operate black cars such as Uber and Lyft. Mr. Ackman represents medallion taxi owners in other lawsuits against the TLC and the City, which allege in part that the City's decision to allow Uber vehicles to operate in New York City was unlawful (*see* Selvin Decl., Exs. S, U, V, W). The City thus contends that Mr. Ackman's representation of Uber drivers here is prohibited under Rule 1.7 of the New York State Rules of Professional Conduct. Nothing in the record, however, supports a finding that the relief Mr. Ackman seeks in those actions—which includes compensatory and punitive damages against the City—is adverse to the interests of Uber drivers here. The City also cites no authority in which a court disqualified an attorney under Rule 23 due

to an alleged conflict based on representing different plaintiffs in unrelated actions against the same defendants. To the extent Mr. Ackman seeks damages from the same defendants in different actions may suggest that the "plaintiffs are theoretically in competition with one another to recover on their judgments," such a conflict can be re-visited in the damages phase of these proceedings, if necessary.[12] *See Seijas v. Republic of Argentina*, 606 F.3d 53, 57 (2d Cir. 2010). Plaintiffs have met their burden of demonstrating the adequacy of class counsel.

### 2. Interests of Plaintiffs

In assessing whether the named Plaintiffs can adequately represent the class, the Court considers "whether there is a conflict between the interests of the named plaintiff[s] and the rest of the class[,]" and "whether the named plaintiff[s] have sufficient knowledge of the facts of [their] claim[s]." *See Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 164 (S.D.N.Y. 2014).

#### a. Intra-Class Conflict

At this stage of the litigation, the existence of intra-class conflict, if any, would not preclude a finding that the named Plaintiffs can represent the interests of the absent class members. To defeat a motion for certification, intra-class conflicts "must be fundamental," *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009), and not "hypothetical and speculative," *Cokely v. N.Y. Convention Ctr. Operating Corp.*, No. 00 Civ. 4637 (CBM), 2004 WL 1152531, at *8 (S.D.N.Y. May 21, 2004).

The City contends that, since the named Plaintiffs were issued summonses for violations of § 19-506(b)(1), their interests are not aligned with class members who received summonses for violations of § 19-506(b)(2). In the City's view, because unlicensed for-hire vehicle owners (i.e.,

---

[12] Moreover, "most courts . . . have directed the defendants to bring any ethical complaints they have in the proper legal disciplinary forums and have not barred class certifications grounded on any determination of the merits of such ethical complaints." 1 Newberg on Class Actions § 3:78 (5th ed. 2018) (citing cases).

the § 19-506(b)(1) violators) "stole trips, customers, and income from licensed for-hire vehicles," (i.e., the § 19-506(b)(2) violators), those class members have conflicting interests. But the interests of § 19-506(b)(1) and (b)(2) violators with respect to the outcome of this litigation are nonetheless aligned—both groups seek to hold the City liable for vehicle seizures and the success of each group's claims does not impact the other. *See In re Flag*, 534 F.3d at 36–37 (affirming decision to permit plaintiffs with claims for violations of the 1933 Securities Exchange Act to represent and proceed in the same class as plaintiffs with claims for violations of the 1934 Securities Exchange Act where district court had concluded that the "the two sets of claims are not antagonistic to each other because proof of one does not negate an essential element in the other").[13]

Additionally, there is no proposed class settlement "reflect[ing] essential allocation decisions" between the § 19-506(b)(1) and (b)(2) violators in which the lack of a representative of the (b)(2) class members could render their representation inadequate. *Cf. Amchem Prods. Inc.*, 521 U.S. at 627 (holding that, in a class action settlement, class members with manifested injuries from asbestos exposure could not represent class members who were exposed to asbestos but had yet to be injured because "for the currently injured, the critical goal [wa]s generous immediate payments" which "tug[ged] against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future"). In any event, if there were such a settlement pending, the Court could resolve the issue by certifying a subclass of § 19-506(b)(2) violators and appointing their own counsel to ensure their adequate representation. *See* Fed. R. Civ. P. 23(c)(5); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d at 250.

---

[13] To be sure, the district court had analyzed the purported conflict between the two groups of plaintiffs in the context of typicality. On appeal, however, the Second Circuit noted that with respect to "any antagonistic interests" between the two groups of plaintiffs, insofar as the plaintiffs with claims under the 1934 Act would have to prove loss causation, while those with claims under the 1933 Act would not, the difference did not "constitute the type of 'fundamental' conflict that renders the class uncertifiable" under grounds of inadequate representation. *In re Flag*, 574 F.3d at 35.

### b. Knowledge and Credibility of Named Plaintiffs

Although the requirement that the class representative have knowledge of the facts of the case is a "modest one," the Court cannot certify a class representative where they "have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possible competing interests of attorneys." *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 203 (S.D.N.Y. 2018). "Where the court finds the class representative is not credible, adequacy of representation is absent." *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 41 (E.D.N.Y. Jan. 31, 2008) (citing *Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir. 1983)).

The Court has concerns that the named Plaintiffs may not be sufficiently knowledgeable and credible to represent the class. For example, DeCastro testified that he did not review the Complaint before it was filed, nor Plaintiffs' initial disclosures before they were served on the City. *See Scott v. N.Y.C. Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 356 (S.D.N.Y. 2004) (declining to find a named plaintiff could represent a class based in part on him "not ha[ving] seen the complaint prior to his deposition"). Compounding this concern, Plaintiffs have not included any deposition testimony in their reply to rebut the City's argument that DeCastro does not have sufficient knowledge of the case to be an adequate representative, suggesting that he might simply be "the willing pawn of counsel." *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 136 (S.D.N.Y. 2008).[14]

---

[14] The City also suggests that DeCastro is not a class member at all, or at least not representative of class members, because he "was not a multiple violator of . . . 19-506, nor was he driving a licensed vehicle that was permitted to have T&LC license plates on it." Defs. Mem. Opp. at 19. But the class definition clearly includes registered owners of vehicles seized "for *any* violation of Section 19-506 involving a vehicle bearing TLC license plates." Pls. Mem. at 4 (emphasis added). Thus, if DeCastro paid the towing and storage fees to retrieve his vehicle he is a member of the class.

As to Calvo and Macon, the City argues that their deposition testimony demonstrates that neither is sufficiently credible to serve as a class representative. The City further argues that Calvo and Macon's purported failure to cooperate in discovery proves that they cannot fulfill their duty as class representatives to comply with discovery requests. Calvo and Macon's deposition testimony, which attests that they were not operating their vehicles for hire, but were merely giving rides to friends, even though they eventually pled guilty to their summonses, may raise questions about their credibility. *See* Selvin Decl. Exs. M, Q. And Macon too testified that he did not review the Amended Complaint before it was filed. *See* Selvin Decl., Ex. Q at 117:1–10. Since the Court declines to certify the class on other grounds, however, it need not decide whether the City has demonstrated that the named Plaintiffs are adequate representatives.

### E. Predominance

The essence of the predominance inquiry under Rule 23(b)(3) is whether proposed classes are "sufficiently cohesive to warrant adjudication by representation." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 469 (2013). A putative class satisfies this requirement if (i) "resolution of any material 'legal or factual questions . . . can be achieved through generalized proof,'" and (ii) "these [common] issues are more substantial than the issues subject only to individualized proof." *Petrobras*, 862 F.3d at 270 (alterations in original) (quoting *Mazzei v. The Money Store*, 829 F.3d 260, 270 (2d Cir. 2016)). This analysis requires district courts to weigh the prevalence of individual questions (i.e., questions where "members of a proposed class will need to present evidence that varies from member to member") against common questions (i.e., questions where "the same evidence will suffice for each member to make a prima face showing or the issue is susceptible to generalized class-wide proof"). *Id.* In other words, the Court asks "whether issues susceptible to generalized proof outweigh individual issues." *Johnson v. Nextel*

*Comms. Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (quotation omitted). This assessment is "more qualitative than quantitative, and must account for the nature and significance of the material common and individual issues in the case." *In re LIBOR*, 2018 WL 1229761, at *5 (alterations and quotations omitted).

In this case, individual questions pertaining to class membership eligibility, to proving liability in light of the City's potential defenses, and to damages, compel the conclusion that common questions do not predominate over individual ones.

### 1. Proving Class Membership

Courts in this Circuit have recognized that the extent to which determining whether someone is a member of a class requires individualized inquiry is an important factor in the predominance analysis. "If too much individual inquiry is required to determine whether someone is a member of the class, then a court could find that class issues do not predominate over individual issues." *Vogel*, 2017 WL 4712791, at *5; *see also Petrobras*, 862 F.3d at 268 (noting that the issue of whether classes "require highly individualized determinations of member eligibility" belongs to the predominance requirement). Assessing membership eligibility in plaintiffs' proposed class—specifically, whether a putative class member paid the towing and storage fees—entails individualized inquiry. And in light of the City's evidence of registration fraud and straw ownership, discussed further below, proving that registered owners actually paid the towing and storage fees, for many putative class members, will be no easy feat.

### a. Registered Owners Using Third-Party Claimants

First, as to registered owners who were not driving the vehicles when they were seized, and who purportedly authorized third-parties to retrieve their vehicles, the Court is not satisfied that the third-party authorization form establishes that the registered owner paid the towing and

storage fees. This is because the City has submitted evidence that these forms were forged. *See* Murray Decl. ¶¶ 32–34; Selvin Decl., Ex. C. For example, the analysis of the City's seizure records shows that some third-party claimants used the same third-party authorization form (i.e., including the same date) more than once to pick up different vehicles on different dates. *See id.* Sometimes the signature of the purported registered owner differed dramatically across the third-party authorization forms; and sometimes the signature on the vehicle *registration* forms differed dramatically from the purported signature of the registered owner on the third-party authorization forms. *See id.* Those differences raise questions about the validity or reliability of the forms as evidence of genuine ownership interest in, and of financial injury associated with, the seized vehicles.

Additionally, the City has presented evidence that some of these registered owners are straw owners, who may not have advanced their own fees to retrieve the vehicles, as required for class membership. In one instance, a vehicle seized three times was registered to a John Doe at the time of the first seizure, but was then registered to a corporate entity at the time of the second and third seizures; the same John Doe retrieved the vehicle after each seizure, however, using the same third-party authorization form. *See* Murray Decl. ¶ 36. This suggests that the transfer of ownership to the entity was illusory, and that the funds used to retrieve the vehicle may not have come from the entity. Some individuals also served as serial third-party claimants for the same registered owner of multiple vehicles. *See id.* ¶¶ 25–27. A significant number of seized vehicles with out-of-state registration addresses were similarly retrieved only by third-party claimants, and the registered owners of those vehicles never operated them at the time of the seizure. *See id.* ¶ 35. While not determinative, this too may suggest that certain registered owners lacked a genuine interest in the vehicles, raising questions about whether they actually paid the towing and storage

fees. In light of this evidence, relying on the City's records alone to determine who actually paid the towing and storage fees will not suffice.[15]

### b. Registered Owners who Personally Retrieved the Vehicles

Second, as to registered owners who were not operating the vehicles when they were seized, but who personally retrieved the vehicles, the City's evidence of straw ownership similarly raises doubts that these owners would have advanced their own funds to pay the fees. Some registered owners, for example, after being found guilty of a § 19-506(b)(1) violation, transferred their vehicles to a certain John Doe who is the registered owner of at least 65 vehicles. *See* Murray Decl. ¶ 23. Although this John Doe would retrieve the vehicles after a second or subsequent seizure, they were nonetheless driven by the original registered owners at the time of those seizures. The seemingly illusory transfer of ownership to this John Doe, coupled with the fact that he is a prolific registered owner, may suggest he is a straw owner, even though he personally retrieved the vehicles. *See* Murray Decl. ¶¶ 37–40. As such, the registered owner may very well not have been the one to pay to retrieve the vehicles.

While credit card records or bank statements could suffice to prove who paid the towing and storage fees, the City's records reflect that they were more commonly paid in cash. Although a putative class member could submit a sworn affidavit testifying that he or she paid the fees, as Judge Caproni previously recognized, *see Calvo I*, 2017 WL 4231431, at *5 n.10, the fact-finder would still need to analyze the individual affidavits. Moreover, to the extent the City contested

---

[15] The City also maintains that some instances in which registered owner-operators authorized third parties to reclaim the vehicles are "questionable." Murray Decl. ¶ 46. Specifically, it provides an example of a vehicle registered in Philadelphia in which the registered owner operated the vehicle during two seizures, but used a third party both times to reclaim the vehicle. The City argues that this example "is suspect" because the vehicle registration address is the same as that of another putative class member, and because the two third-party claimants are also registered owners of other vehicles that were seized. *Id.* But it is not clear to the Court that those facts necessarily suggest that the registered owners did not pay the towing and storage fees or otherwise lacked a legitimate ownership interest in the vehicles.

the credibility of a particular affiant—which is likely, given that many putative class members appear to be involved in the illegal business of unlicensed for-hire vehicle operations—more process would be required before a final conclusion that the affiant is a member of the class could be made.

It is true that the City has shown that they possess copies of various documents—the summonses issued to registered owners, vehicle seizure notices and release forms, and receipts of payments of towing and storage fees—which can show who picked up the vehicle from the tow pound, the amount they paid to retrieve the vehicle, and the method of payment used. *See* Olson Decl. ¶ 4. Nevertheless, for many putative class members, establishing membership in the class will require sworn affidavits. And because their credibility is put into doubt by the City's evidence of fraud, the individualized inquiries entailed in determining whether those registered owners are legitimate class members, threaten to predominate over the common questions of liability. *See Mazzei*, 829 F.3d at 270 (finding plaintiffs failed to meet predominance requirement where "the fact-finder would have to look at every class members' loan documents to determine who did and who did not have a valid claim"); *Royal Park Investments SA/NV v. Wells Fargo Bank, N.A.*, No. 14-CV-09764 (KPF)(SN), 2018 WL 739580, at *14 (S.D.N.Y. Jan. 10, 2018) (noting absence of "class-wide proof" as to which putative plaintiffs had litigation rights as required for class membership "militates against a finding of predominance with regard to issues of who actually has a claim"). Proving class membership thus requires additional evidence to establish that the registered owners paid the towing and storage fees.

### 2. Individual Liability Defenses and Damages

The extent to which Defendants have liability defenses that are unique to certain class members is also an important factor in the predominance analysis. *See In re Visa Check/Master*

*Money Antitrust Litig.*, 280 F.3d 124, 129 (2d Cir. 2001). "Although a defense may arise and may affect different class members differently, this does not compel a finding that individual issues predominate over common ones." *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010) (quotations and alterations omitted). "As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of a defense will not automatically foreclose class certification under Rule 23(b)(3)." *Id.* Similarly, while individual issues pertaining to each class members' damages should be considered "when weighing predominance issues," such "individualized damages determinations alone cannot preclude certification." *Roach*, 778 F.3d at 408–9 (2d Cir. 2015); *Royal Park*, 2018 WL 1831850, at *8 ("[I]ndividualized damages inquiries remain a factor that a court may consider in undertaking the predominance analysis.").

Despite the combined holdings in *Harrell I* and *DeCastro I*—that the City's seizure policy encoded in § 19-506(h) as applied to violations of § 19-506(b)(1) is unconstitutional (*see* 138 F. Supp. 3d at 488–92; 278 F. Supp. 3d at 768–72)—the City nevertheless argues that it has individualized probable cause defenses to liability as to specific class members. Because the Court is persuaded that at least some of the City's proffered grounds for a probable cause defense may apply to certain putative class members, some individual inquiry into the circumstances surrounding each seizure will be necessary. While these individual questions do not provide a stand-alone basis to find that the class fails to pass muster under Rule 23(b)(3), they nonetheless contribute to the conclusion that individual issues predominate over common ones.

The City's first argument in this regard is that TLC officers, in some instances, may have had probable cause to believe that a vehicle was subject to civil forfeiture under § 19-506(h)(2), based on knowledge that the registered owner had a prior conviction under § 19-506(b) in the preceding 36 months. The Court disagrees. In *DeCastro I*, the Court found that "the undisputed

evidence shows that TLC inspectors do not have probable cause to believe a vehicle is subject to forfeiture under § 19-506(h)(2) when they seize vehicles for suspected violations of § 19-506(b)(1)." 278 F. Supp. 3d at 772. That finding was based in part on deposition testimony of the TLC's Deputy Chief of Enforcement that inspectors "don't look" at "whether or not [a] vehicle or [a] driver has been cited for a violation of Section 19-506" when seizing vehicles. *See id.* (citing St. Laurent Decl. Ex. 3 at 77:6–13 (Dkt. 61)).

Now, in a second attempt to provide contrary evidence of its policy, the City produces four summonses associated with seizures based on second or subsequent violations of § 19-506(b)(1). *See* Murray Decl. Ex. HH. The City argues that these summonses demonstrate that the officers had knowledge of the registered owners' prior convictions, sufficient to establish probable cause on forfeiture grounds. *See* § 19-506(h)(2). Yet this new evidence does not help the City. Two of the summonses indeed indicate that the registered owners of the vehicles were either an "unlicensed entity" with a "prior record" or had "prior records of unlicensed activity." Murray Decl. Ex. HH, at 7152, 7276. But they do not indicate whether the registered owner had been *convicted* of a § 19-506(b)(1) violation within the preceding 36 months, as would be required for the vehicle to be subject to forfeiture. *See DeCastro I*, 278 F. Supp. 3d at 770 (explaining that a summons "is not a reliable indicator of a conviction or a finding of liability"). Another summons states that the TLC officer "seized th[e] vehicle one month prior" but doesn't state whether the registered owner was convicted. Murray Decl. Ex. HH, at 9856. Although the final summons states that the "[d]river said he has been caught before with the vehicle and the owner went and plead guilty," it doesn't indicate whether the conviction occurred within the preceding 36 months. *See id.* at 3837. Thus, the Court is not persuaded that many individual inquiries would be required to

determine whether the officers had probable cause to believe the vehicles were subject to civil forfeiture under § 19-506(h)(2).[16]

The Court *is* persuaded, however, that the City may possess other unique probable cause defenses for a certain subset of class members. The City, for example, has shown through Mulero's testimony that some vehicle seizures occurred for purposes other than, or in addition to, suspected violations of § 19-506(b)(1).[17] *See* Selvin Decl. Ex. E at ¶ 4 (asserting that "[it] is not unusual for other illegal activity to be observed at the time of a [§ 19-506] summons" including aggravated unlicensed operation of a vehicle, criminal possession of a weapon, narcotics offenses, prostitution, among others). The presence of such other illegal activity in connection with a § 19-506 violation could conceivably provide the City with additional probable causes defenses to justify a seizure in those circumstances. The seizures of putative class members' vehicles would therefore need to be individually assessed to determine if the seizure occurred in conjunction with other activity that provided the City with probable cause to seize the vehicles. This could require individual hearings. *See Vogel*, 2017 WL 4712791, at *6 (determining whether defendants had probable cause for each putative class member's arrest solely for possession of a gravity knife would require "individualized inquiry []in the form of hearings or mini-trials"). And such hearings would further add to the number of individual inquiries necessary to determine which class

---

[16] For vehicle seizures occurring after December 2016, the City explains that the software in the handheld devices used by TLC inspectors to issue summonses was updated to allow officers to "personally search the violation history of a vehicle owner at the time of the stop to determine if the owner violated [§ 19-506(b)]" within the preceding 36 months. Murray Decl. ¶ 54. The City claims that, since the new software was introduced, the TLC has seized approximately 50 vehicles that were subject to forfeiture under § 19-506(h)(2) and that the vehicle seizure notice issued with the summons at the time of the violation lists the owners' prior § 19-506(b)(1) violations. While this constitutes persuasive evidence that the City has genuine forfeiture-based probable cause defenses as to vehicle seizures based on § 19-506(b)(1) violations occurring after December 2016, such seizures are beyond the date of the class period that the Court has set for the purposes of this Opinion.

[17] Although Mr. Mulero's affidavit cites "19-506" generally, and not § 19-506(b)(1) specifically, the Court construes his testimony to apply only to § 19-506(b)(1) seizures. This is because the testimony references only vehicles seized for "unlicensed for-hire activity" as opposed to activity concerning licensed vehicles acting beyond the scope of their license.

members are entitled to damages. *See MacNamara v. City of New York*, 275 F.R.D. 125, 144–45 (S.D.N.Y. 2011) (holding that "individualized probable cause inquiries would dictate the course of litigation with respect to" two subclasses because the underlying arrests were "conducted by officers exercising individual discretion rather than following mass arrest orders"). Although Plaintiffs argue that such individuals would not be part of the class, the class definition is not limited to vehicles seized *only* for § 19-506(b) violations: registered owners whose vehicles were seized for additional reasons therefore appear to fit within the class definition. In any event, even if the class definition were modified to specifically exclude such individuals, the Court would then need to assess whether a vehicle seizure occurred in connection with other illegal activity in order to determine membership in the class.[18]

Moreover, with respect to damages, the City correctly notes that claims for lost income, lost use of vehicle, and emotional distress would likely need to be assessed on an individualized basis which further adds to the number of individualized inquiries. *See Augustin v. Jablonsky*, 819 F. Supp. 2d 153 (E.D.N.Y. 2011) (concluding that emotional distress damages of class members subjected to an unconstitutional strip search policy could not be determined on a class-wide basis).

To be clear, the existence of individual defenses based on conduct occurring in conjunction with a § 19-506 violation, and the existence of individual damages would not, independently, preclude a finding that predominance has been satisfied. Where, as here, Plaintiffs have established that Defendants applied a uniform unconstitutional policy, courts in this Circuit have

---

[18] The Court is not persuaded by the City's argument that the question of whether the instrumentality of crime exception to the warrant requirement applies as to those class members that were issued criminal (as opposed to civil) summonses for § 19-506(b)(1) violations. For substantially the same reasons provided in *DeCastro I*, and on the record when this Court denied Plaintiffs' motion for reconsideration (*see* Oct. 25, 2018 Hr'g Tr. Dkt. 13), whether or not the City issues a civil summons for a § 19-506(b)(1) violation, as opposed to a criminal one, should not alter the fact that the instrumentality of crime exception does not apply to the underlying vehicle seizure. In any event, the Court need not, and does not, decide the issue as the other individual questions discussed in this Opinion predominate over common questions.

found that individual affirmative defenses, and individual damages, will not outweigh the common questions underlying the defendants' conduct. *See, e.g.*, *In re Nassau Cty.*, 461 F.3d at 229–230. But when combined with the individual issues associated with determining whether someone is a member of the class, in this case, individual questions ultimately predominate over common ones. Plaintiffs have thus failed to satisfy Rule 23(b)(3).[19] *See Vogel*, 2017 WL 4712791, at *6.

Finally, additional issues would need to be addressed as to the subset of class members who were issued summonses for § 19-506(b)(2) violations. As the City highlights, the Court has not decided whether the City's seizure policy encoded in § 19-506(h), as applied to seizures based on § 19-506(b)*(2)* violations, is unconstitutional. The Court's decision in *DeCastro I* was based on factual evidence concerning the City's enforcement practices only with respect to violations of § 19-506(b)(1). At this time, the Court is skeptical that there are material differences with respect to the City's enforcement practices of § 19-506(b)(2), and with respect to the Fourth Amendment analysis regarding those putative plaintiffs' claims. But the Court cannot rule on whether the City's codified policy in § 19-506(h), as applied to vehicles seized for violations of § 19-506(b)(2), is unconstitutional, let alone as applied to a vehicle seizure of any individual Plaintiff, absent a factual record on that issue. As a result, even though the Court has already found that the proposed class fails the predominance requirement for the reasons sated above, the issues of liability that may apply uniquely to class members with § 19-506(b)(2) violations add to the predominance problem of Plaintiffs' proposed class.[20]

*     *     *

---

[19] Although a Court can certify a liability only class pursuant to Fed. R. Civ. P. 23(c)(4), and have damages proceed individually, the Court is not convinced that doing so could save the fundamental predominance problems with this class.

[20] Because the Court declines to certify the class on predominance grounds, it does not address whether a class action would be a superior method of adjudication.

Due to the difficulties of proving class membership based on the evidence of fraud and straw ownership associated with violators of § 19-506(b)(1), it appears unlikely that there is a definable class as to those violators that can satisfy Rule 23.[21] A class of *only* § 19-506(b)(2) violators may have fewer predominance issues given the lack of evidence of fraud and straw ownership with respect to those putative class members. Nevertheless, because there has been no determination as to whether the City has engaged in a pattern or practice of unconstitutionally seizing vehicles of § 19-506(b)(2) violators, it is difficult to predict whether common questions would predominate over individual ones in such a hypothetical class. Moreover, were Plaintiffs to seek certification of a class comprised of only § 19-506(b)(2) violators, they would need to persuade the Court that they should be granted leave to amend the Complaint to add new named plaintiffs, as the current ones would not fit within this narrower class definition.[22]

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification is DENIED. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 117. No later than October 4, 2019, the parties shall submit a joint letter to the Court proposing next steps in this case.

SO ORDERED.

Dated:     September 19, 2019
           New York, New York

                                            Ronnie Abrams
                                            United States District Judge

---

[21] In their supplemental briefing addressing the *Calvo II* decision, Plaintiffs requested that the court also consider a class of: "(a) all registered owners of TLC-plate vehicles and registered owners of straight-plate vehicles with one or more prior Section 19-506 violations within the previous 36 months and (b) whose car was seized by the TLC (c) while the registered owner was driving it, or which was personally retrieved by the registered owner after its seizure." The Court is not persuaded that this definition satisfies the predominance requirement of Rule 23(b)(3), however, for the same reasons addressed above. In addition, the absence of a limitation with respect to the payment of towing and storage fees in that alternative definition amplifies the Court's concerns that not every member of such a class would have standing, again for reasons previously explained.

[22] The operative Complaint included named plaintiffs whose vehicles were seized for violations of § 19-506(b)(2). Those plaintiffs have since accepted Rule 68 offers of judgment, however, and are thus no longer part of the case. *See* Dkts. 36, 37.