UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ USDC-SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC#:                                │
│ DATE FILED: 8/24/2020                │
└─────────────────────────────────────┘
```

ANGEL DECASTRO, SUSAN CALVO, and
KELLY MACON, *individually and on behalf
of all others similarly situated*,

                         Plaintiffs,

            v.

THE CITY OF NEW YORK and THE NEW
YORK CITY TAXI AND LIMOUSINE
COMMISSION,

                         Defendants.

No. 16-CV-3850 (RA)


OPINION & ORDER


RONNIE ABRAMS, United States District Judge:

        Plaintiffs Angel DeCastro, Susan Calvo, and Kelly Macon filed this action against the City

of New York and its Taxi and Limousine Commission, alleging that the City's enforcement of its

regulations regarding the operation of vehicles for hire violates their constitutional rights.[1]  Now

before the Court is Plaintiffs' motion for leave to amend the complaint to add Korah Ittiyavirah as

a named plaintiff and class representative, and thus, to add a new group of plaintiffs to the instant

action.  For the reasons that follow, Plaintiffs' motion is denied.

## BACKGROUND

        The Court assumes familiarity with the underlying facts and procedural history of this case,

which have been detailed at length in the Court's prior decisions.  *See DeCastro v. City of New

York*, 278 F. Supp. 3d 753, 756-63 (S.D.N.Y. 2017) ("*DeCastro I*") (granting in part and denying

in part the parties' cross-motions for summary judgment); *DeCastro v. City of New York*, No. 16-

---

[1] All claims against the City's Taxi and Limousine Commission have been dismissed.

CV-3850 (RA), 2019 WL 4509027, at *1-4 (S.D.N.Y. Sept. 19, 2019) ("*DeCastro II*") (denying Plaintiffs' motion for class certification).  The Court therefore includes only those facts necessary to resolve the instant motion.

## I.   The Operative Complaint

Plaintiffs Angel DeCastro, Michael Walker, Susan Calvo, and Yong Zhang initially filed this putative class action on May 24, 2016.  *See* Dkt. 7.[2]  On July 14, 2016, the Court entered a Case Management Plan and Scheduling Order (the "Scheduling Order"), which provided, among other things, that no amendments to the pleadings may be made after August 29, 2016 without leave of the Court.  *See* Dkt. 24.  Pursuant to the deadline set forth in the Scheduling Order, Plaintiffs filed an Amended Class Action Complaint—the operative complaint—on August 26, 2016, adding Iosif Mullaev and Kelly Macon as named plaintiffs.  *See* Dkt. 27 (the "Amended Complaint" or "AC").

In this action, Plaintiffs challenge the constitutionality of the City's policy and practice of "seizing vehicles without a warrant to assist in the payment of civil fines that could be imposed under NYC Admin. Code § 19-506 ('Section 19-506')," namely where such seizures were based "either on (a) an unadjudicated claim that a TLC-licensed vehicle was acting beyond the scope of

---

[2] As the outset, it is worth noting that the instant case is not the first in which Plaintiffs—and their counsel—have brought challenges to the City's seizure of vehicles based on suspected violations of NYC Admin. Code § 19-506.  In September 2014, certain individuals and entities—including several of the plaintiffs in this action—filed suit on behalf of those "whose vehicles have been seized by the TLC based on allegations of first-time violations" of § 19-506, alleging that such seizures violated the Fourth and Fourteenth Amendments.  *See Harrell v. City of New York*, No. 14-cv-7246 (VEC), Dkt. 1 (Initial Complaint) ¶ 94.  Plaintiffs in *Harrell* filed an amended complaint in November 2014, *see id*, Dkt. 24, a second amended complaint in February 2016, *see id.*, Dkt. 89, and a corrected second amended complaint in April 2016, *see id.*, Dkt. 101.  Prior their filing of the February 2016 second amended complaint, however, Judge Caproni denied Plaintiffs' request to amend the complaint to "add claims on behalf of second or subsequent violators" of § 19-506, and ordered that Plaintiffs' "permitted amendments [were] limited to adding not more than three new plaintiffs who are complaining about a 'first time violation' seizure and correcting allegations regarding the date of the 'first time violation' seizure of the existing named plaintiffs."  *See id.*, Dkt. 80.  Plaintiffs filed this separate action approximately three months later as a result.  In fact, Plaintiffs sought to the have this action deemed as related to the *Harrell* action.  *See* Dkt. 8.

its license or (b) an unadjudicated claim that a person with a conviction for violating Section 19-506 in the previous 36 months either was using a vehicle as a 'for hire' vehicle without a TLC license or was using the vehicle beyond the scope of its TLC license."[3]  AC ¶ 2.  Each of the individual plaintiffs asserts that the City unconstitutionally seized their vehicles based on alleged violations of Section 19-506.  *See id.* ¶ 66.  Section 19-506 "makes it unlawful to operate a taxi or for-hire vehicle in the City of New York without a TLC license."  *Id.* ¶ 33.  Two specific subsections of Section 19-506 are particularly relevant here.[4]  First, Section 19-506(b)(1) makes it illegal to knowingly operate or allow another to operate any vehicle for hire "without first having obtained or knowing that another has obtained a license for such vehicle."  N.Y.C. Admin. Code § 19-506(b)(1).  Second, Section 19-506(b)(2) makes it illegal for any person to "permit another to operate or . . . [to] knowingly operate or offer to operate for hire" any vehicle licensed as a for-hire vehicle "in a manner that is beyond the scope of the activities permitted by such vehicle's license."  N.Y.C. Admin. Code § 19-506(b)(2).  Any officer or designated TLC employee may seize a vehicle "which he or she has probable cause to believe is operated . . . without a vehicle license" in violation of Section 19-506(b)(1), or "without an appropriate vehicle license for such operation," in violation of Section 19-506(b)(2).  *See* N.Y.C. Admin. Code § 19-506(h)(1).

According to the Amended Complaint, this action is brought on behalf of the individual named plaintiffs, as well as "two groups of plaintiffs" whose vehicles were seized within the relevant time period: (1) "second or subsequent violators," i.e., "plaintiffs who had convictions under Section 19-506 within the previous 36 months," and (2) "TLC-licensed owners," i.e.,

---

[3] As noted in *DeCastro I*, "[u]nder the Rules of the City of New York, a 'for-hire vehicle' is defined as 'a motor Vehicle licensed by the Commission to carry Passengers for-hire in the City,' which: (1) '[h]as a seating capacity of 20 or fewer Passengers'; (2) '[h]as three or more doors'; and (3) '[i]s not a Taxicab, a Commuter Van, or an authorized bus as defined by NYS law.'"  *DeCastro I*, 278 F. Supp. 3d at 756 n.3  (quoting 35 R.C.N.Y. § 51-03).

[4] This regulatory framework is described in further detail in the Court's prior opinions.  *See DeCastro I*, 278 F. Supp. 3d at 756-58; *DeCastro II*, 2019 WL 4509027, at *1.

"owners of TLC-licensed vehicles who were allegedly operating beyond the scope of their licenses." AC ¶¶ 7, 11. Plaintiffs allege that "hundreds or thousands" of the City's seizures between 2013 and 2015 that were based on alleged violations of Section 19-506 were "based on allegations that a TLC-licensed vehicle was being operated beyond the scope of its license in violation of Section 19-506(b)(2) or based on an allegation that the driver was a 'second or subsequent offender' of Section 19-506(b)(1) or (b)(2)." *Id.* ¶¶ 44-45; *see also id.* ¶ 50 ("TLC inspectors routinely seize vehicles based on allegations that a TLC-licensed vehicle was being operated beyond the scope of its license in violation of Section 19-506(b)(2) or based on an allegation that the driver was a 'second or subsequent offender' of Section 19-506(b)(1) or (b)(2)."). In the Amended Complaint, Plaintiffs thus propose that a class be certified with "two subclasses": first, "a subclass consisting of alleged 'second or subsequent' offenders of Section 19-506(b)(1) and (b)(2)," and second, "a subclass consisting of owners or lessors of TLC-licensed vehicles alleged to be first-time violators of Section 19-506(b)(2)." *Id.* ¶ 113.

## II.   Individual Plaintiffs

It is undisputed that the vehicles of Plaintiffs Angel DeCastro, Susan Calvo, and Kelly Macon were all seized for violations of Section 19-506(b)(1).[5] *See* Dkt. 181, Pls. Mot. ("Mot."), at 2; Dkt. 182, Def. Opp'n ("Opp'n"), at 5. As the Court previously explained, "Plaintiffs Calvo and Macon had both been found liable for violations of § 19-506(b)(1) in the preceding 36 months from when the seizures at issue occurred. DeCastro, by contrast, was a first-time violator who was operating a TLC-plated vehicle—not a straight-plate vehicle—at the time it was seized. Because the vehicle had not yet been licensed as a for-hire vehicle by the TLC, however, it was not

---

[5] Although neither party directly addresses the circumstances under which Plaintiff Yong Zhang's vehicle was seized, it appears that Plaintiff Zhang's vehicle was also seized for a violation of Section 19-506(b)(1). *See DeCastro II*, 2019 WL 4509027, at *17 n.22 (indicating that Plaintiffs Walker and Mullaev were the only plaintiffs whose vehicles were seized for violations of Section 19-506(b)(2)).

authorized to bear TLC license plates. DeCastro was therefore issued a summons for violating §
19-506(b)(1), as opposed to § 19-506(b)(2)."[6] *DeCastro II*, 2019 WL 4509027, at *2 n.2. It is
further undisputed that the vehicles of Plaintiffs Michael Walker and Iosif Mullaev were seized
for violations of Section 19-506(b)(2), as opposed to (b)(1). *See* Opp'n at 9; Dkt. 183, Pls. Reply
("Reply"), at 2.

Between July and October 2016, three of the six named plaintiffs received and accepted
offers of judgment pursuant to Federal Rule of Civil Procedure 68. Specifically, on July 12, 2016,
the City made a Rule 68 offer of judgment to Plaintiff Zhang, which he accepted on July 26, 2016.
*See* Dkts. 30, 30-1. Next, on August 1, 2016, the City made a Rule 68 offer of judgment to Plaintiff
Walker, which he accepted on August 9, 2016. *See* Dkts. 33, 33-1. Finally, on September 19,
2016, the City made a Rule 68 offer of judgment to Plaintiff Mullaev, which he accepted on
October 2, 2016. *See* Dkts. 34, 34-1. On October 18, 2016, the Court ordered judgment pursuant
to Rule 68 as to Plaintiff Zhang, *see* Dkt. 31, and on October 20, 2016, the Court ordered judgment
pursuant to Rule 68 as to both Plaintiff Walker and Plaintiff Mullaev, *see* Dkts. 36, 37.

## III.   Motions for Summary Judgment and Class Certification

On February 3, 2017, the remaining Plaintiffs—Plaintiffs DeCastro, Calvo, and Macon—
moved for summary judgment against Defendants based on their respective vehicle seizures, each
of which occurred as a result of Section 19-506(b)(1) violations. *See* Dkt. 59. Defendants filed a
cross-motion for summary judgment on May 8, 2017. *See* Dkt. 77. On September 30, 2017, in
*DeCastro I*, the Court granted in part and denied in part the parties' motions for summary
judgment. In particular, the Court granted Plaintiffs summary judgment on all claims asserted by

---

[6] "A 'straight plate' vehicle is a vehicle that is not registered as a 'for hire' vehicle." *See Calvo v. City of New York*,
No. 14-CV-7246 (VEC), 2018 WL 1633565, at *3 n.2 (S.D.N.Y. Apr. 2, 2018) (citing *Harrell v. City of New York*,
138 F. Supp. 3d 479, 485 n.3 (S.D.N.Y. 2015)).

DeCastro and on Calvo and Macon's Fourth Amendment claims, but granted the City summary judgment on Calvo and Macon's Fourteenth Amendment claims.  *See DeCastro I*, 278 F. Supp. 3d at 775-76.  The constitutionality of the City's seizure practices as applied to TLC-licensed drivers who violate their licenses under Section 19-506(b)(2) was not adjudicated.  *See DeCastro I*, 278 F. Supp. 3d at 757 n.4; *DeCastro II*, 2019 WL 4509027, at *2.

On November 8, 2017, Plaintiffs filed a motion for class certification.  *See* Dkt. 117. Plaintiffs sought to certify a class of "all registered owners of vehicles seized since September 8, 2011 for alleged second or subsequent violations of [Section 19-506(b)(1)]; or for any violation of Section 19-506 involving a vehicle bearing TLC license plates; who were operating the vehicle at the time of the seizure or who retrieved the vehicle personally or through an agent by paying towing and storage fees."  *See* Dkt. 118, Cert. Mot., at 4.  They also sought to certify the class under Rule 23(b)(3), which mandates that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).[7]  In opposing Plaintiffs' motion, the City argued, among other things, that since the named plaintiffs were issued summonses for violations of Section 19-506(b)(1), their

---

[7] The Court subsequently stayed Plaintiffs' class certification motion pending the Second Circuit's decision on whether to grant their petition under Federal Rule of Civil Procedure 23(f) seeking immediate appellate review of Judge Caproni's decision in *Calvo v. City of New York*, No. 14-CV-7246 (VEC), 2018 WL 1633565 (S.D.N.Y. Apr. 2, 2018) ("*Calvo II*"), a similar case—which was initially filed as *Harrell v. City of New York*, No. 14-cv-7246 (VEC)— challenging the constitutionality of the City's warrantless seizure of vehicles based on suspected violations of Section 19-506(b)(1).  *See* Dkt. 156.  In *Calvo II*, Judge Caproni had denied Plaintiffs' second motion for class certification, in which Plaintiffs sought to certify a class of "all registered owners of straight-plate vehicles seized for alleged first-time violations of [Section 19-506] from September 8, 2011 to present who were operating the vehicle at the time of the seizure, or who retrieved the vehicle personally or through an agent by paying towing and storage fees."  *See* 2018 WL 1633565, at *1, *3.  After the Second Circuit denied the Rule 23(f) petition in *Calvo II*, this Court received supplemental briefing from the parties as to how Judge Caproni's decision affected its ruling on the pending motion for class certification.  *See* Dkts. 165, 166.

interests were not aligned with putative class members who received summonses for violations of Section 19-506(b)(2). *See* Dkt. 134, Cert. Opp'n, at 5, 17-18.

On September 19, 2019, in *DeCastro II*, the Court denied Plaintiffs' motion for class certification.  The Court concluded that, while Plaintiffs met the numerosity, commonality, and typicality requirements of Rule 23, the proposed class could not be certified because Plaintiffs failed to satisfy the predominance requirement of Rule 23(b)(3).[8]  *See DeCastro II*, 2019 WL 4509027, at *8.  As relevant here, the Court explained that it would have to undertake an "individualized inquiry" as to "whether a putative class member paid the towing and storage fees" in order to evaluate class membership eligibility, but "proving that registered owners actually paid the towing and storage fees" would not be an "easy feat" for many putative class members "in light of the City's evidence of registration fraud and straw ownership." *Id.* at *13.[9]  As such, the "individualized inquiries" required to determine "whether those registered owners are legitimate class members[] threaten[ed] to predominate over the common questions of liability." *Id.* at *14.

Ultimately, in *DeCastro II*, the Court concluded that, "[d]ue to the difficulties of proving class membership based on the evidence of fraud and straw ownership associated with violators of § 19-506(b)(1), it appears unlikely that there is a definable class as to those violators that can satisfy Rule 23." *Id.* at *17.  In so ruling, the Court also noted that "[a] class of *only* § 19-506(b)(2) violators may have fewer predominance issues given the lack of evidence of fraud and straw

---

[8] For purposes of its opinion, the Court also assumed, without deciding, that the proposed class had standing under Article III, *see DeCastro II*, 2019 WL 4509027, at *5-6, and that Plaintiffs were adequate class representatives, *see id.* at *10.

[9] The City had presented evidence that some of the third-party authorization forms—used by registered owners who were not driving the vehicles when they were seized and who purportedly authorized third parties to retrieve their vehicles as a result—were forged.  *See DeCastro II*, 2019 WL 4509027, at *13.  The City also presented evidence that certain of the registered owners were "straw owners," who may not have advanced their own fees to retrieve the seized vehicles and therefore may "lack[] a genuine interest in the vehicles, raising questions about whether they actually paid the towing and storage fees." *See id.*

ownership with respect to those putative class members." *Id.*  The Court noted, however, that "because there has been no determination as to whether the City has engaged in a pattern or practice of unconstitutionally seizing vehicles of § 19-506(b)(2) violators, it [was] difficult to predict whether common questions would predominate over individual ones in such a hypothetical class." *Id.*  The Court also cautioned that even if Plaintiffs were "to seek certification of a class comprised of only § 19-506(b)(2) violators, they would need to persuade the Court that they should be granted leave to amend the Complaint to add new named plaintiffs, as the current ones would not fit within this narrower class definition." *Id.*

Indeed, the Court made clear in *DeCastro II* that "no Court has yet to address whether the application of the City's seizure policy, as codified in § 19-506(h)(1), to enforce violations of § 19-506(b)(2)—as opposed to (b)(1)—is unconstitutional."[10]  *Id.* at *10.  *DeCastro I*, for instance, addressed only the constitutionality of the City's seizure of straight-plate vehicles "for second or subsequent violations of § 19-506(b)(1), and for first-time violations of § 19-506(b)(1) for TLC-plated vehicles."  *Id.*  The Court thus explained that:

> [A]dditional issues would need to be addressed as to the subset of class members who were issued summonses for § 19-506(b)(2) violations.  As the City highlights, the Court has not decided whether the City's seizure policy encoded in § 19-506(h), as applied to seizures based on § 19-506(b)(2) violations, is unconstitutional.  The Court's decision in *DeCastro I* was based on factual evidence concerning the City's enforcement practices only with respect to violations of § 19-506(b)(1).  At this time, the Court is skeptical that there are material differences with respect to the City's enforcement practices of § 19-506(b)(2), and with respect to the Fourth Amendment analysis regarding those putative plaintiffs' claims.  But the Court cannot rule on whether the City's codified policy in § 19-506(h), as applied to vehicles seized for violations of § 19-506(b)(2), is unconstitutional, let alone as applied to a vehicle seizure of any individual Plaintiff, absent a factual record on that issue.  As a result, even though the Court has already found that the proposed class fails the predominance requirement for the reasons [stated] above, the issues of liability that may

---

[10] In *DeCastro II*, the Court rejected the City's assertion—made in its opposition to Plaintiffs' class certification motion—that the named Plaintiffs' interests, as Section 19-506(b)(1) violators, conflicted with those of Section 19-506(b)(2) violators, noting that "the interests of § 19-506(b)(1) and (b)(2) violators with respect to the outcome of this litigation are nonetheless aligned" as "both groups seek to hold the City liable for vehicle seizures and the success of each group's claims does not impact the other."  *Id.* at *11.

apply uniquely to class members with § 19-506(b)(2) violations add to the predominance problem of Plaintiffs' proposed class.

*Id.* at *16.

Following the Court's decision in *DeCastro II*, the parties submitted a joint letter with proposed next steps for the case, including proposed deadlines for the parties' pre-trial materials, as well as proposed dates for a final pre-trial conference and for trial to commence. *See* Dkt. 168. On October 8, 2019, the Court issued an order directing the parties to file their joint pre-trial materials by December 13, 2019, scheduling the final pre-trial conference for February 17, 2020, and setting trial to commence on February 24, 2020. *See* Dkt. 169.[11]

## IV.    The Proposed Second Amended Complaint

On November 1, 2019, Plaintiffs filed a letter seeking a pre-motion conference or a briefing schedule on a motion to amend the complaint in order to include as a plaintiff and potential class representative an Uber driver whose vehicle was seized by the City "solely in connection with a violation of [Section] 19-506(b)(2)." *See* Dkt. 172 at 1.  Plaintiffs asserted that this potential new plaintiff "is now[,] and was at the time of the seizure, TLC-licensed, as was the vehicle he was driving," and that the seizure of his vehicle "was not an isolated incident but was part of a larger pattern or practice by [the City] to seize TLC-licensed vehicles allegedly used outside the scope of their license." *Id.* at 2.  They asserted further that "because TLC-licensed drivers are highly regulated, it is likely that a class made up solely of such drivers would have fewer predominance issues going to membership in the class," that "seizures of those vehicles are less likely to be associated with other activity that could provide a constitutional basis for seizure," and that "the lost income associated with the loss of use of their vehicles[] would likely be subject to proof on

---

[11] The Court subsequently extended the deadline by which the parties were to file responses to the motions *in limine* and adjourned the final pre-trial conference to February 21, 2020.  *See* Dkt. 171.

a class-wide basis." *Id.* On November 5, 2019, the Court set a briefing schedule on Plaintiffs'
motion to amend and adjourned *sine die* the deadlines for the parties' pre-trial materials, as well
as the trial itself, pending resolution of the motion. *See* Dkt. 175. Plaintiffs then filed their motion
on November 25, 2019. Dkt. 180. The City filed its opposition on January 10, 2020, Dkt. 182,
and Plaintiffs filed their reply on January 24, 2020, Dkt. 183.

The proposed Second Amended Class Action Complaint (the "SAC"), *see* Dkt. 181-1,
seeks to add Korah Ittiyavirah as a named plaintiff and putative class representative.[12] According
to the SAC, Ittiyavirah has worked as a "TLC-licensed professional driver primarily, if not
exclusively, for Uber since approximately 2010." SAC ¶ 86. Plaintiffs assert that Ittiyavirah is
—and at all relevant times was—"TLC-licensed as a driver and the owner and operator of a car
bearing 'T plates' and with its own TLC-issued identification number." *Id.* They allege that on
approximately July 2, 2015, Ittiyavirah's vehicle was seized by an undercover TLC inspector for
an alleged violation of Section 19-506(b)(2). *Id.* ¶ 87. The undercover officer had apparently
"hailed the vehicle" on the street and asked Ittiyavirah to take him to LaGuardia Airport. *Id.* ¶ 88.
As a result, Ittiyavirah received a summons "for operating his vehicle outside the scope of his TLC
license, which permitted him to accept passengers only for rides pre-arranged through a dispatcher,
and not via street hail." *Id.* Plaintiffs maintain that, after Ittiyavirah pled guilty, he was "required
to pay several hundred dollars in fines and over a thousand dollars in towing and storage fees to
recover his vehicle." *Id.* ¶ 89. They also assert that Ittiyavirah lost the use of his vehicle for three
days, "causing him to lose substantial income" as his vehicle is his "primary source of income,"
and that he "suffered emotional damages" as well. *Id.*

---

[12] The SAC also formally removes from this action Plaintiffs Yong Zhang, Michael Walker, and Iosif Mullaev, all of
whom accepted Rule 68 offers of judgment in 2016.

In addition to their individual claims, Plaintiffs now seek to bring this action on behalf of "all vehicle owners or lessors alleged to have violated Section 19-506(b)(2) and/or owners or lessors of TLC-licensed vehicles seized for alleged violations of Section 19-506." *Id.* ¶ 90.  As to the proposed class period, Plaintiffs seek to bring claims on behalf of such "TLC-licensed owners" whose vehicles were seized within the three years preceding the filing of the initial complaint in this action.  *Id.* ¶ 11.  As such, the putative class period would begin on May 23, 2013 and, because the City "ceased seizing vehicles pursuant to this policy no later than 2016," would end on December 31, 2016.  *Id.*

## LEGAL STANDARDS

Typically, a motion to amend is evaluated under Federal Rule of Civil Procedure 15(a), which provides that "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000).  Notwithstanding the liberal standard of Rule 15(a), a court may deny leave "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  District courts have broad discretion in ruling on a motion for leave to amend a complaint.  *See Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 96 (S.D.N.Y. 2010) (collecting cases); *see also Orellana v. Macy's Retail Holdings, Inc.*, No. 17 Civ. 5192 (NRB), 2018 WL 3368716, at *7 (S.D.N.Y. July 10, 2018) ("Whether to grant leave, however, is ultimately 'within the sound discretion of the district court.'") (quoting *McCarthy*, 482 F.3d at 200).

Where a party files a motion to amend after the pleading deadline set forth in the scheduling order has expired, however, Federal Rule of Civil Procedure 16(b) governs.  *See Parker*, 204 F.3d at 339.  In such a case, "the lenient standard under Rule 15(a) . . . must be balanced against the

requirement under Rule 16(b) that the Court's scheduling order" may be modified only for "good cause."  *Holmes v. Grubman*, 568 F.3d 329, 334-35 (2d Cir. 2009) (citation omitted); *see also Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 243 (2d Cir. 2007) ("Although Rule 15(a) governs the amendment of pleadings, Rule 16(b) also may limit the ability of a party to amend a pleading if the deadline specified in the scheduling order for amendment of the pleadings has passed.").  Accordingly, "a district court, despite the standard of . . . Rule 15(a), does not abuse its discretion in denying leave to amend the pleadings where the moving party has failed to establish good cause, as required by Rule 16(b), to amend the pleadings after the deadline set in the scheduling order." *Kassner*, 496 F.3d at 243 (citing *Parker*, 204 F.3d at 339-40).[13]

Under Rule 16(b), a scheduling order may be modified only upon a showing of "good cause." Fed. R. Civ. P. 16(b)(4); *see Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 267 (2d Cir. 2009) ("Once the deadline for amendment in a scheduling order has passed, leave to amend may be denied 'where the moving party has failed to establish good cause.'") (citation omitted).  Indeed, "Rule 16(b) expressly provides that a scheduling order is to limit the time for amendment of the pleadings and, in so doing, 'is designed to offer a measure of certainty in pretrial proceedings[.]'" *Kassner*, 496 F.3d at 243 (quoting *Parker*, 204 F.3d at 339-40).  Within the meaning of Rule 16(b), a finding of good cause "depends on the diligence of the moving party." *Parker*, 204 F.3d at 340; *see also Scott v. Chipotle Mexican Grill, Inc.*, 300 F.R.D. 193, 197

---

[13] Where the movant seeks to add parties to an action, Federal Rule of Civil Procedure 21, which provides that "the court may at any time, on just terms, add or drop a party," is technically "the operative rule."  *See Mason Tenders Dist. Council of Greater New York v. Phase Constr. Servs., Inc.*, 318 F.R.D. 28, 36 (S.D.N.Y. 2016) (citation omitted).  Nonetheless, "the same standard of liberality applies under either Rule [21 or 15(a)]." *Duling*, 265 F.R.D. at 96-97 (internal quotation marks and citation omitted); *see Mason Tenders*, 318 F.R.D. at 36 ("[T]he showing necessary under Rule 21 is the same as that required under Rule 15(a).") (internal quotation marks and citation omitted).  Indeed, "[w]here, as here, a scheduling order governs amendments to the complaint, the Second Circuit has held that the lenient standard under Rule 15(a) *or Rule 21* must be balanced against the requirement under Rule 16(b) that the Court's scheduling order shall not be modified except upon a showing of good cause." *Mason Tenders*, 318 F.R.D. at 36 (citations omitted) (emphasis added).

(S.D.N.Y. 2014) ("To show good cause, a movant must demonstrate diligence before filing her motion, such that despite the movant's effort, the deadline to amend the pleadings could not have been reasonably met.").  "[T]he good cause standard of Rule 16 is not satisfied when the proposed amendment rests on information that the party knew or should have known, in advance of the deadline."  *Youngers v. Virtus Inv. Partners Inc.*, No. 15-cv-8262, 2017 WL 5991800, at *3 (S.D.N.Y. Dec. 4, 2017) (internal quotation marks, alterations, and citation omitted).  Thus, "the court may deny leave to amend where the party seeking it knew or should have known the facts sought to be added to the complaint."  *Cummins, Inc. v. N.Y. Life Ins.*, No. 10 Civ. 9252, 2012 WL 3870308, at *3 (S.D.N.Y. Sept. 6, 2012); *see also Porter v. MooreGroup Corp.*, No. 17-CV-07405 (KAM) (VMS), 2020 WL 32434, at *5 (E.D.N.Y. Jan. 2, 2020) ("Courts have declined to find good cause where the movant was aware of facts giving rise to the claim, or where such information was available to the movant, at the time the movant commenced the action.").  "It is within the Court's discretion to apply the good cause standard after the deadline to amend."  *Scott*, 300 F.R.D. at 197.

"If the part[y] seeking the amendment satisf[ies] the 'good cause' standard of Rule 16, the court then determines whether the movant has also met the liberal standards of Rule 15."  *Youngers*, 2017 WL 5991800, at *6 (alteration and citation omitted).  Even if good cause is established, however, a court may deny a motion to amend if the proposed amendment "would be futile, unduly prejudicial, or otherwise improper based on the Rule 15(a) standards that otherwise govern motions to amend."  *See id.* (citation omitted).  The movant has the burden of demonstrating good cause, while the non-movant has the burden of demonstrating prejudice.  *See Scott*, 300 F.R.D. at 198 (citations omitted).

# DISCUSSION

The Scheduling Order entered in this action sets forth a deadline of August 29, 2016 for any amendments to the pleadings.  Dkt. 24.  Accordingly, Plaintiffs filed the Amended Complaint on August 26, 2016, and this case proceeded based on the allegations contained in that complaint for over three years before they sought to amend once again.  The key inquiry for the Court now is whether Plaintiffs have established that good cause exists to permit their amendment at this stage of the litigation.  *See Kassner*, 496 F.3d at 243.  The Court concludes that they have not.

## I.  Diligence

Plaintiffs argue that good cause exists here because they "acted diligently by filing their request for a pre-motion conference seeking the right to amend" six weeks after the Court's decision denying their motion for class certification—which apparently "first brought to the attention of the Plaintiffs the particular circumstances justifying amendment"—and "mere days" after they were retained by Ittiyavirah.  *See* Mot. at 5-6.  Plaintiffs contend that because they did not know how the Court would rule on their class certification motion until its September 2019 decision, and did not know about Ittiyavirah's case until October 2019, the proposed amendment "could not have been known to Plaintiffs when the original 2016 amendment deadline lapsed." *See id.* at 6.[14]  Although it may be true that Plaintiffs did not know specifically about Ittiyavirah or his vehicle seizure until October 2019, the Court is unpersuaded by their argument that, prior to the Court's decision in *DeCastro II*, they were unaware that they needed an individual with a

---

[14] Plaintiffs also contend that the SAC and the Amended Complaint both seek to bring claims on behalf of classes for which "membership is defined by what type of injury someone suffered, not by what was written on the summons issued when their vehicle was unconstitutionally seized," and that therefore, both DeCastro and Ittiyavirah fall into their proposed class definition. *See* Reply at 3; *see also id.* at 5 ("Mr. Mullaev and Mr. Walker are irrelevant to the viability of Mr. Ittiyavirah's class claims.  Plaintiffs are seeking to certify a class of owners or lessors of TLC-plated vehicles, and Mr. DeCastro, who remains in the case, saw his TLC-plated vehicle seized within the proposed class period.").

Section 19-506(b)(2) violation in order to assert claims on behalf of a class of Section 19-506(b)(2) violators.  Plaintiffs have long been aware of the distinction between (b)(1) violators and (b)(2) violators.  In their Amended Complaint, they asserted specifically that the action was brought on behalf of both the named individual plaintiffs and "two groups of plaintiffs," i.e., "the 'second or subsequent violators' and the 'TLC-licensed owners.'"  AC ¶ 11.  Accordingly, they proposed that a class be certified with "two subclasses," a "subclass consisting of alleged 'second or subsequent' offenders of Section 19-506(b)(1) and (b)(2)," and a separate "subclass consisting of owners or lessors of TLC-licensed vehicles alleged to be first-time violators of Section 19-506(b)(2)."  *Id.* ¶ 113.  In their motion papers too, Plaintiffs acknowledge that Ittiyavirah—and the class he seeks to represent—would be a different set of individuals than those in which the current plaintiffs could represent.  *See, e.g.*, Mot. at 2-3.  While they may not have known how the Court would rule on the potential class that they first sought to certify, they always knew that there were two different groups of plaintiffs on behalf of whom they could assert claims based on alleged Section 19-506 violations.

The acceptance of certain Rule 68 offers of judgment in this case is particularly relevant to the instant motion.  Rule 68 offers were made to and accepted by three of the six named plaintiffs in 2016, including Plaintiffs Walker and Mullaev—the only named plaintiffs whose vehicles were seized for alleged violations of Section 19-506(b)(2).  Judgment was entered pursuant to Rule 68 for Plaintiffs Walker and Mullaev in October 2016.  *See* Dkts. 36, 37.  Thus, as of October 2016, the remaining named plaintiffs in this action—Plaintiffs DeCastro, Calvo, and Macon—had all received only Section 19-506(b)(1) violations, and therefore could not assert claims on behalf of (b)(2) violators.[15]  Although an unaccepted Rule 68 offer does not moot a plaintiff's claims, *see*

---

[15] It is well established that, in the class action context, a named plaintiff must have standing to assert both its own individual claims and the class claims brought on behalf of the putative class.  *See McCall v. Chesapeake Energy*

*Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016), an *accepted* Rule 68 offer does. *See*

*Bank v. All. Health Networks, LLC*, 669 F. App'x 584, 585 (2d Cir. 2016) ("[W]here judgment has

been entered and where the plaintiff's claims have been satisfied, . . . any individual claims are

rendered moot."); *see also Sanders v. Houslanger & Assocs., PLLC*, No. 17 Civ. 8985 (DC), 2018

WL 6444922, at *3 (S.D.N.Y. Nov. 5, 2018) ("The Second Circuit has made clear that, in the

context of Rule 68 offers of judgment, 'after judgment is entered, the plaintiff's individual claims

will become moot for purposes of Article III.'") (quoting *Tanasi v. New All. Bank*, 786 F.3d 195,

200 (2d Cir. 2015)) (emphasis omitted). While *Bank* did not decide what effect an accepted Rule

68 offer has on a plaintiff's *class* claims, the Second Circuit nonetheless suggested that an accepted

Rule 68 offer may indeed moot such claims as well. *See Bank*, 669 F. App'x at 586 (noting that

"where the individual claims of the putative class representative are rendered moot prior to

certification, in general 'the entire action becomes moot,'" but finding that since "Bank was the

sole individual representative for the putative class, once his claim was no longer live, no plaintiff

remained in a position to pursue the class claims") (citation omitted); *see also Bais Yaakov of

Spring Valley v. Educ. Testing Serv.*, 251 F. Supp. 3d 724, 733 (S.D.N.Y. 2017) (noting that *Bank*

---

*Corp.*, 509 F. App'x 62, 64 (2d Cir. 2013); *Amador v. Andrews*, 655 F.3d 89, 99 (2d Cir. 2011) ("Of course, a class action cannot be sustained without a named plaintiff who has standing."). Accordingly, "[f]or each claim asserted in a class action, there must be at least one class representative (a named plaintiff or a lead plaintiff) with standing to assert that claim." *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp. 2d 322, 331 (S.D.N.Y. 2012); *see also Jobie O. v. Spitzer*, No. 03 Civ. 8331 (CM), 2007 WL 4302921, at *3 (S.D.N.Y. Dec. 5, 2007) ("[I]n order to represent a class, the named plaintiff must personally have standing to litigate his own claim."). If Plaintiffs lack standing to assert a particular claim, the Court "lacks subject matter jurisdiction to entertain the class relief requested" as to that claim. *See Jobie O.*, 2007 WL 4302921, at *3. And claims "for which the class representatives do not have standing[] must be dismissed." *Fort Worth Emps.' Ret. Fund*, 862 F. Supp. 2d at 332. Moreover, even if a case has several named plaintiffs, where the claims of a particular named plaintiff have become moot, and the other named plaintiffs lack standing to assert them, those claims are typically dismissed. *See, e.g.*, *Leonard v. Abbott Labs., Inc.*, No. 10-CV-4676 (ADS) (WDW), 2012 WL 764199, at *7 (E.D.N.Y. Mar. 5, 2012) ("Generally, the dismissal of the named plaintiffs claims before a motion for class certification has been filed would result in the dismissal of the complaint, or, in this case, the putative New York class' NYCPA cause of action."); *Bowens v. Atl. Maint. Corp.*, 546 F. Supp. 2d 55, 76 (E.D.N.Y. 2008) ("The unnamed class members are not technically part of the action until the court has certified the class; therefore, once the named plaintiffs' claims are dismissed, there is no one who has a justiciable claim that may be asserted.").

"left much ambiguity in its decision, saying at one point that it need not answer whether 'the rendering moot of a plaintiff's individual claims undermines that plaintiff's standing to pursue claims on behalf of a putative class,' but then affirming the dismissal of the case on the ground that because the plaintiff, as the sole named plaintiff on behalf of the class, no longer had a live claim, the class action was moot") (quoting *Bank*, 669 F. App'x at 585).

District courts in this Circuit have also suggested that, where a Rule 68 offer of judgment is made to and accepted by a named plaintiff prior to the filing of a motion for class certification, both the individual and the potential class claims of that named plaintiff become moot. *See, e.g.*, *Perez v. Cent. Credit Servs. LLC*, No. 17-cv-6018 (ADS) (ARL), 2018 WL 1135554, at *2 (E.D.N.Y. Feb. 27, 2018) ("[A] Rule 68 offer would only moot a class action lawsuit if a Rule 68 offer was made and accepted by the Plaintiff."); *Perez-White v. Advanced Dermatology of New York P.C.*, No. 15 Civ. 4858 (PGG), 2016 WL 4681221, at *7 (S.D.N.Y. Sept. 7, 2016) ("Some courts have concluded, however, that where a named plaintiff in a class or collective action has been provided with full monetary relief, that plaintiff no longer has a live claim."); *LaVoice v. UBS Fin. Servs., Inc.*, No. 11 Civ. 2308 (KMW) (JLC), 2013 WL 5380759, at *3 n.6 (S.D.N.Y. Sept. 26, 2013) ("Because the Court has not yet certified a class in this action, dismissal of the named plaintiff's claims requires dismissal of the entire action."); *Morgan v. Account Collection Tech., LLC*, No. 05-CV-2131 (KMK), 2006 WL 2597865, at *4 (S.D.N.Y. Sept. 6, 2006) ("Some courts readily compel a Rule 68 offer of complete relief to an individual plaintiff prior to certification and dismiss the case as moot without explicitly considering the timing of the offer. . . . Other courts consider the timing of the offer and the diligence of the plaintiff in pursuing class certification to determine if the plaintiff had a reasonable opportunity to file for certification or if there has been

undue delay."); *cf. Drabek v. Elsevier, Inc.*, No. 16-cv-6786 (DLC), 2017 WL 570952, at *3 (S.D.N.Y. Feb. 13, 2017) ("Since the settlement offer was not accepted, this claim is not moot.").[16]

Plaintiffs' actions following the three named plaintiffs' Rule 68 offers and acceptances—in October 2016—makes clear that they were well aware that such judgments, if entered, would and did moot the claims of those plaintiffs. The day after the Court entered a Rule 68 judgment as to one of the six initial named plaintiffs (Plaintiff Zhang), Plaintiffs filed a letter seeking to modify the Scheduling Order so that they could immediately—and prematurely—file a motion for class certification in light of the fact that two other named plaintiffs (Plaintiffs Walker and Mullaev) had also accepted Rule 68 offers by that point, and in the hopes of "avoiding the possibility that [other] accepted Rule 68 offers could moot the action." *See* Dkt. 32. Defendants opposed this request, particularly since discovery was ongoing and the parties had agreed to file any motions for summary judgment prior to those for class certification. *See* Dkt. 35. The Court held a telephonic conference with the parties on October 26, 2016, during which Plaintiffs' counsel again expressed concern that Defendants could theoretically make additional Rule 68 offers to the remaining three named plaintiffs—i.e., Plaintiffs DeCastro, Calvo, and Macon—which could then potentially moot the action—and a proposed class—as to those plaintiffs as well. *See, e.g.*, Dkt. 46 ("Oct. 2016 Tr.") at 3. They thus sought to make an early motion for class certification to "avoid that result." *See id.* During the October 2016 conference, there was no question that the

---

[16] The Court notes that "the application of the mootness doctrine in class action cases is complex, and hinges on the timing of certification of the class." *See Elisa W. v. City of New York*, No. 15-CV-5273 (LTS) (HBP), 2017 WL 3841868, at *2 (S.D.N.Y. Sept. 1, 2017). "[I]f the claims of the named plaintiffs become moot prior to class certification, the entire action becomes moot." *See Comer v. Cisneros*, 37 F.3d 775, 798 (2d Cir. 1994) (citing *Bd. of Sch. Comm'rs of Indianapolis v. Jacobs*, 420 U.S. 128, 129-30 (1975) (per curiam)). "In contrast, class certification will preserve an otherwise moot claim." *Id.*; *see also Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 494 (S.D.N.Y. 2013) ("If no named plaintiff has standing to represent the potential class of plaintiffs who have suffered the alleged injury giving rise to the action, courts typically dismiss the action in its entirety."); *Morgan*, 2006 WL 2597865, at *2 ("Generally, when an offer of judgment constitutes full relief for the named plaintiff's substantive claims, the plaintiff ceases to have a personal stake in the case and the court lacks jurisdiction.") (citing *Abrams v. Interco Inc.*, 719 F.2d 23, 32 (2d Cir.1983)).

three plaintiffs who had accepted Rule 68 offers, including the only two (b)(2) violators, were no longer part of the case, nor were the claims asserted on behalf of them. *See id.* at 2, 4. Plaintiffs, however, did not attempt to identify or add new (b)(2) violators as named plaintiffs or potential class representatives until over three years later.

The claims related to allegedly unconstitutional vehicle seizures based on underlying violations of Section 19-506(b)(2) were effectively dismissed from the case as of October 2016— well before class certification was sought. *See DeCastro II*, 2019 WL 4509027, at *17 n.22 ("The operative Complaint included named plaintiffs whose vehicles were seized for violations of § 19-506(b)(2). Those plaintiffs have since accepted Rule 68 offers of judgment, however, and are thus no longer part of the case."). As the Court previously noted, the constitutionality of the City's seizure practices as applied to alleged Section 19-506(b)(2) violators has not been adjudicated. Section 19-506(b)(2) was not addressed at summary judgment. *See DeCastro I*, 278 F. Supp. 3d at 757 n.4. And at the class certification stage, the Court expressly noted that, in light of the lack of a factual record concerning the City's enforcement practices with respect to violations of Section 19-506(b)(2), it could not rule on "whether the City's codified policy in § 19-506(h), as applied to vehicles seized for violations of § 19-506(b)(2), is unconstitutional, let alone as applied to a vehicle seizure of any individual Plaintiff." *DeCastro II*, 2019 WL 4509027, at *16. The Court thus agrees with the City that not only were the individual claims of Plaintiffs Walker and Mullaev moot as of October 2016, if not earlier, but so too were the "related class claims for which those two plaintiffs were the only eligible putative class representatives." Opp'n at 2.

Plaintiffs do not explain how, if at all, they acted diligently to identify potential class representatives for a class or subclass of Section 19-506(b)(2) violators over the past three years —from October 2016, when judgment was entered as to Plaintiffs Walker and Mullaev, to October

2019, when they first were retained by Ittiyavirah.   Nor have Plaintiffs demonstrated why Ittiyavirah waited so long to seek judicial relief—over four years after his vehicle seizure—and what, if anything, they did to look for a potential class representative like him during that time.[17] "A party fails to show good cause when the proposed amendment rests on information that the party knew, or should have known, in advance of the deadline." *Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.*, 889 F. Supp. 2d 453, 457 (S.D.N.Y. 2012) (internal quotation marks and citation omitted).  Plaintiffs knew, or should have known, at least as of October 2016, that none of the named plaintiffs had standing to assert constitutional violations on behalf of Section 19-506(b)(2) violators, and that they therefore needed a named plaintiff who had received a Section 19-506(b)(2) violation in order to assert those claims.  This point was specifically raised in the opposition to Plaintiffs' class certification motion, where Defendants asserted that the interests of the named plaintiffs—who were issued summonses for violations of Section 19-506(b)(1)—were not aligned with putative class members who received summonses for violations of Section 19-506(b)(2).  *See* Cert. Opp'n at 5, 17-18.  Although the Court rejected that argument, Plaintiffs were—and have been—indisputably aware of this potential flaw throughout the duration of this case.  The Court is thus not persuaded that Plaintiffs have acted diligently, or met their burden to establish good cause, under these circumstances.[18]

---

[17] The Court does not address the parties' arguments regarding whether Ittiyavirah's claims are barred by the statute of limitations period, but it nevertheless notes that "[a] would-be class representative who commences suit after expiration of the limitation period . . . can hardly qualify as diligent in asserting claims and pursuing relief." *See China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1808 (2018).

[18] The Court also notes that, pursuant to the Scheduling Order, the deadline for any amendment to the pleadings was August 29, 2016, and judgment was not entered as to Plaintiffs Walker and Mullaev—the alleged Section 19-506(b)(2) violators—until two months later, in October 2016.  Even taking those dates into account, however, Plaintiffs have not demonstrated diligence, or established good cause, in light of the three years that subsequently elapsed between when those judgments were entered and when Plaintiffs first indicated an intent to move to amend.  And, in any event, Plaintiff Walker accepted his Rule 68 offer prior to the Scheduling Order's deadline to amend.  *See* Dkt. 36.

## II.  Delay and Prejudice

While the "primary consideration" of the good cause analysis is "whether the moving party can demonstrate diligence," the Second Circuit has explained that it "is not . . . the only consideration." *Kassner*, 496 F.3d at 244.  A court may properly "consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." *Id.*; *see also Werking v. Andrews*, 526 F. App'x 94, 96 (2d Cir. 2013) ("We will find 'good cause' where the moving party has demonstrated 'diligence,' . . . and the amendment would not significantly prejudice the nonmoving party.") (citations omitted); *Kassner*, 496 F.3d at 243-44 ("Rule 16(b), in allowing modifications of scheduling orders only for good cause, provides the district courts discretion to ensure that limits on time to amend pleadings do not result in prejudice or hardship to either side.").  A finding of prejudice may "constitute an independent ground on which the Court may deny the motion [to amend], even [where] plaintiffs have demonstrated good cause." *See Scott*, 300 F.R.D. at 199-200; *see also Youngers*, 2017 WL 5991800, at *7 ("Prejudice to the opposing party if the motion is granted has been described as the most important reason for denying a motion to amend.") (citation omitted).  In determining whether an amendment would be prejudicial to the opposing party, courts consider, among other things, whether the amendment would "require the opponent to expend significant additional resources to conduct discovery and prepare for trial," and whether it would "significantly delay the resolution of the dispute." *See Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993). The Second Circuit has also noted that it is "particularly likely to find prejudice where the parties have already completed discovery and the defendant has moved for summary judgment." *Werking*, 526 F. App'x at 96; *see also Youngers*, 2017 WL 5991800, at *7 ("The most obvious situation in which [] prejudice arises is where the motion to amend comes on the eve of trial after many months

21

or years of pre-trial activity.") (internal quotation marks and citation omitted).  Nonetheless, the need for new discovery or supplemental briefing, without more, is insufficient to constitute undue prejudice.  *See Duling*, 265 F.R.D. at 100-01.

The Court may also consider delay in its analysis, although delay alone will not negate a plaintiff's showing of good cause.  *See Block*, 988 F.2d at 350 (2d Cir. 1993) ("Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend.") (citation omitted); *see also Youngers*, 2017 WL 5991800, at *6 (noting that the "issue of delay dovetails with the diligence inquiry underlying the Rule 16 good cause analysis").  Delay and prejudice are often analyzed in tandem, as "the longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." *Block*, 988 F.2d at 350 (quoting *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 47 (2d Cir. 1983)).  As such, a court properly denies leave to amend "where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice other parties."  *See Grace v. Rosenstock*, 228 F.3d 40, 53-54 (2d Cir. 2000) (internal quotation marks and citation omitted).

Considerations of delay and prejudice here weigh against granting Plaintiffs leave to amend at this late stage in the litigation.  As the City points out, Plaintiffs' request to amend their complaint comes "more than three and a half years after the filing of the original complaint, three years after the close of discovery, more than two years after summary judgment was granted, three months after class certification was denied, and mere weeks before pre-trial motions were due to be filed for a trial commencing in February."  Opp'n at 14.  As to prejudice, the City asserts that permitting Plaintiffs' proposed amendment "would lead to the reopening of discovery years after it closed, a second round of dispositive motions, a potential second class certification motion, and

an expanded trial, causing the City to expend a significant amount of additional resources." *Id.* at 15.

The Court agrees with the City.  District courts are well within their authority to deny motions for leave to amend under circumstances like those present here.  *See, e.g.*, *Presbyterian Church of Sudan*, 582 F.3d at 267 (affirming district court's judgment and noting that the court had "found that plaintiffs failed to show good cause, and that '[i]t could even be said that the plaintiffs acted in bad faith in waiting until the eve of summary judgment practice to file the motion to amend") (quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 680 (S.D.N.Y. 2006)); *McCarthy*, 482 F.3d at 202 (affirming district court's decision to deny motion to amend where, by the time plaintiffs sought leave to amend, "discovery had closed, defendants had filed for summary judgment, and nearly two years had passed since the filing of the original complaint"); *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (affirming district court's decision to deny motion to amend where "plaintiffs delayed more than one year before seeking to amend their complaint" and where, "when the motion was filed, discovery had been completed and a summary judgment motion was pending"); *Youngers*, 2017 WL 5991800, at *8 (denying motion to amend and finding that the "prejudice factor weighs against amendment" where "both fact and expert discovery has closed, class certification was briefed once before, and the record is otherwise ripe for summary judgment or trial"); *Park B. Smith, Inc. v. CHF Indus. Inc.*, 811 F. Supp. 2d 766, 779 (S.D.N.Y. 2011) (denying motion to amend where discovery was "underway" and plaintiff moved to amend "over four years after the initial complaint was filed" and "on the same day that the parties completed briefing on [defendant's] dispositive summary judgment motion"); *Davis v. Lenox Hill Hosp.*, No. 03 Civ. 3746 (DLC), 2004 WL 1926086, at *4 (S.D.N.Y. Aug. 31, 2004) (denying motion to amend where class discovery had closed, plaintiff

waited "five days *after* the close of class discovery to file her motion to amend the complaint," and plaintiff had "been aware since the filing of this lawsuit of the obstacles facing her class claims").[19]

This action has now been pending for over four years—or really, for almost six years if considering the original case before Judge Caproni, which Plaintiffs sought to have deemed related to this action.  Discovery has long been complete, summary judgment and class certification motions have already been decided, and the case was ripe for trial to begin at the time Plaintiffs sought to amend.  In fact, when Plaintiffs first indicated their intent to move for leave to amend, the Court had already set a deadline for the parties' pre-trial materials to be filed, and the start date for trial had already been scheduled.  And although they disagree over the extent of the additional discovery that would be required and how burdensome it would be, the parties nonetheless seem to agree that additional discovery and briefing would indeed be necessary if Plaintiffs are permitted to amend.  Allowing Plaintiffs' proposed amendment would likely push off further proceedings in this case for months, and would undoubtedly "significantly delay the resolution of the dispute."

---

[19] The cases on which Plaintiffs rely are inapposite.  In *Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91 (S.D.N.Y. 2010), for instance, not only did plaintiffs move to amend "just days after receiving defendants' opposition to their motion for class certification, which argued that the existing plaintiffs were inadequate class representatives and that their claims were atypical," *see* 265 F.R.D. at 98, but also they did so "well before the deadline for such motions set in [the court's] Scheduling Order," *id.* at 97.  The court thus noted that the "relatively minor amount of further deposition or written discovery that defendants may need to conduct regarding these claims should be easily completed within the time the Scheduling Order allows for discovery," *id.* at 100, and that the "prejudice that would flow from any additional required discovery can generally be mitigated by adjustments to the discovery schedule," *id.* at 101. *D.J v. Conn. St. Bd. of Educ.*, No. 16-cv-01197 (CSH), 2019 WL 1499377 (D. Conn. Apr. 5, 2019) is also distinguishable as it was undisputed there that plaintiff had acted diligently "to identify and propose a substitute plaintiff after hearing the Court's concerns," and that "little or no additional briefing or discovery [would] be necessary with respect to class certification or summary judgment." 2019 WL 1499377, at *5.  Indeed, because the motions for class certification and summary judgment had been fully briefed and "the parties agree[d] as a general matter that the completed briefing will continue to apply," the court found that this was "the rare case in which permitting amendment is the *more* expeditious course of action." *Id.*  Nor does *Youngers v. Virtus Inv. Partners Inc.*, No. 15-cv-8262, 2017 WL 5991800 (S.D.N.Y. Dec. 4, 2017), lend support to Plaintiffs' arguments.  In *Youngers*, the court *denied* the motion to amend where the parties had been litigating the case "for nearly two and a half years," and leave to amend was sought "following the completion of fact discovery, in the midst of expert discovery, and shortly after [the] Court's decision to deny class certification." *See* 2017 WL 5991800, at *1; *cf. Scott*, 300 F.R.D. at 200 (noting that defendant was not prejudiced "because discovery has not yet concluded" and "[a] court is more likely to find an amendment prejudicial if discovery has closed").

*See Block*, 988 F.2d at 350.  Under these circumstances, the Court cannot conclude that Plaintiffs have satisfied their burden of establishing good cause.  Plaintiffs' motion for leave to amend is therefore denied.[20]

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for leave to amend the complaint—to add Ittiyavirah as a named plaintiff and proposed class representative for a new group of plaintiffs asserting claims based on violations of a different statutory provision, one they have known about since the inception of this case—is denied.  The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 180.  No later than September 8, 2020, the parties shall submit a joint letter to the Court proposing next steps in this case.

SO ORDERED.

Dated:    August 24, 2020
          New York, New York

Ronnie Abrams
United States District Judge

---

[20] Because the Court finds that Plaintiffs have not met the good cause standard of Rule 16(b), it does not specifically address the other factors of the Rule 15(a) analysis.  *See Youngers*, 2017 WL 5991800, at *6.